# WILSON ET UX. *v.* BOARD OF COUNTY COMMISSIONERS OF ALLEGANY COUNTY ET AL.

[No. 146, September Term, 1974.]

*Decided November 7, 1974.*

The cause was argued before SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ., and E. MACKALL CHILDS, Associate Judge of the Fifth Judicial Circuit and ROBERT F. SWEENEY, Chief Judge of the District Court of Maryland, specially assigned.

*Lawrence F. Rodowsky,* with whom were *Shale D. Stiller* and *Frank, Bernstein, Conaway & Goldman* on the brief, for appellants.

*Luke Marbury* and *William J. McCarthy,* with whom were *Venable, Baetjer & Howard* and *Fred H. Anderson, County Attorney,* on the brief, for Board of County Commissioners of Allegany County, part of appellees. *Edward O. Clarke, Jr.,* with whom were *Wm. Gar Richlin* and *Piper & Marbury* on the brief, for SCM Corporation and Dover Poultry Products, Inc., part of appellees. Submitted on brief by *Francis B. Burch, Attorney General, Henry R. Lord, Deputy Attorney General,* and *Michael J. Milton, Special Assistant Attorney General,* for the State of Maryland, part of appellees; by *S. Nelson Weeks, James C. Doub* and *Miles & Stockbridge* for Allied Chemical Corporation, part of appellees; and by *Benjamin L. Brown, City Solicitor, Ambrose T. Hartman, Deputy City Solicitor* and *Robert Edelson, Assistant City Solicitor,* for Mayor and City Council of Baltimore, other appellees.

SMITH, J., delivered the opinion of the Court.

We shall here affirm a holding that revenue bonds proposed to be issued by the County Commissioners of Allegany County (the County) in connection with pollution control measures to be installed by Westvaco Corporation (the Company) are valid. The Company has a plant at Luke in Allegany County. Its 2000-man payroll is of substantial importance to a county with a population as reflected by the 1970 census of approximately 84,000 people. Appellants, William L. Wilson and wife (Wilson), are taxpayers of Allegany County who challenged the validity of the bond issue.

It is contended by Wilson that (1) the proposed bond issue is invalid because of the lack of sufficient public purpose; (2) even if the construction of facilities calculated to abate air and water pollution be deemed a sufficient public purpose, a public purpose will not be served in this instance since the company is under an order to construct the facilities; (3) the proposed bond issue is invalid because (a) work on the facilities began prior to the effective date of the act authorizing the financing of pollution abatement facilities, and (b) the construction began before the passage of a resolution by the County; and (4) bonds may not be issued for (a) that portion of the facilities to be constructed in West Virginia and (b) that portion to be constructed in Garrett County. We granted certiorari prior to the consideration of the case by the Court of Special Appeals because of the importance of the issues and the fact that this Court has not given prior consideration to the points raised.

The bonds in question are to be issued under the provisions of Maryland Code (1957, 1971 Repl. Vol., 1973 Cum. Supp.) Art. 41, §§ 266A-266-I, inclusive (the Act). Pertinent portions of §§ 266A and 266B state:

"§ 266A. Definitions.

"(a) *Industrial building or buildings.* — As used in this subheading, the term 'industrial building' or 'buildings' means any building or structure, or

portion thereof, suitable for or intended for use as a factory, . . . and/or necessary or useful machinery and equipment, to be leased or sold to an industrial concern . . . by the . . . county by which it is acquired. . . . The term also means the land site or interests in land necessary or desirable for the building or structure, together with roads, or other rights of access, utilities, and other necessary facilities. . . .

"(b) * * *

"(c) *Industrial building and port facilities; acquisition.* — The terms 'industrial building' and 'port facility' include (1) an addition, extension, or permanent improvement thereto, and (2) 'pollution control facilities.' The term 'acquisition' includes the rehabilitation, remodeling, extension, or permanent improvement of an industrial building or a port facility.

"(d) *Pollution control facilities.* — The term 'pollution control facilities' means any building, structure, machinery, equipment or facility designed for the control, reduction, prevention or abatement of pollution of the natural environment by gaseous, liquid, or solid substances, discharges or radiation, (including adverse thermal effects therefrom), noise or any combination thereof. The term . . . includes but shall not be limited to pollution control facilities which can be financed by bonds determined to be tax exempt under provisions of the Internal Revenue Code of 1954. Pollution control facilities may be constructed as part of, and may include, facilities also designed for the recovery of chemicals or other products or to serve some other purpose, but which also contribute to the control or abatement of such environmental pollution.

"(e) *Municipality; county.* — . . . 'County' means one of the twenty-three counties of Maryland

"§ 266B. Revenue bond issues authorized; ordinance or resolution; eminent domain; dedication of pollution control facilities; findings conclusive.

"(a) *Legislative findings.* — Legislative findings are made that: (1) conditions of unemployment exist in many areas of this State; (2) the development of new commercial, industrial and manufacturing plants are essential to relieve this unemployment and to establish a balanced economy within this State; (3) the present and prospective health, happiness, safety, right of gainful employment, and general welfare of the citizens of each of the counties and municipalities of this State will be promoted by the establishment of industrial buildings and port facilities as herein provided; and (4) the control or abatement of pollution of the environment of this State is necessary to retain existing industry in, and attract new industry to, this State and to protect the health, welfare and safety of the citizens of this State, to protect the natural resources of this State and to encourage the economic development of this State.

"(b) *Legislative purpose.* — It is the declared legislative purpose to relieve conditions of unemployment in this State, to encourage the increase of industry and a balanced economy in this State, to assist in the retention of existing industry in this State through the control, reduction or abatement of pollution of the environment, to promote economic development, to protect natural resources and in this manner to promote the health, welfare and safety of the residents of each of the counties and municipalities of this State.

"(c) *Power of municipality or county to issue revenue bonds.* — In order better to accomplish the foregoing purposes, in addition to whatever other

powers it may have and notwithstanding any limitation of law, any . . . county may borrow money by issuing negotiable revenue bonds for the purpose of financing the cost of acquiring any industrial building or buildings . . . , either by purchase or construction. . . .

"(d) *Ordinance or resolution.* — An ordinance or resolution shall be adopted by the legislative body of the . . . county specifying the proposed undertaking, the amount of bonds to be issued, the rate or rates of interest the bonds are to bear, or the method of determining such rate or rates, and such other provisions not inconsistent with this subheading as shall be determined by such legislative body to be necessary or desirable to effect the financing of the proposed undertaking. The ordinance or resolution shall further provide that the industrial building . . . is to be acquired pursuant to the provisions of this subheading, and shall also provide that the industrial building . . . is to be acquired for a bona fide tenant or tenants or purchaser or purchasers, as the case may be, as evidenced by a letter of intent or similar agreement between the prospective tenant or tenants or purchaser or purchasers and the . . . county issuing the bonds.

"(e) * * *

"(f) *Findings of legislative body conclusive.* — In any suit, action, or proceeding involving the validity or enforceability of any bond issued under this subheading or the security therefor, any finding by the legislative body of the . . . county in regard to the existence or relief of conditions of unemployment, the increase of industry in this State, the retention of existing industry in this State, the control and abatement of pollution, the promotion of economic development, the creation of a balanced economy, the protection of natural

resources, and the promotion of the health, welfare and safety of the residents of such . . . county shall be conclusive."

The facts were stated by the trial judge (Getty, J.) in a comprehensive and well-reasoned opinion:

"The mill at Luke was originally constructed in the late 19th century and has been periodically expanded and modernized so that today it produces approximately 300,000 tons of high-grade paper annually and employs approximately 2,000 persons.

"In the manufacturing process, the mill uses or consumes enormous quantities of chemicals, fuel, water, and wood. Of necessity, in the process the mill discharges substantial amounts of gas and liquid effluents into the air of Allegany County and into the adjacent Potomac River, which is situated within Allegany County.

"In 1969 and early 1970, engineers from Westvaco met with the enforcement agents of the Department of Water Resources of the State of Maryland and the division of Air Quality Control of the Environmental Health Services of the State of Maryland, formally and informally, to plan a strategy for bringing the plant at Luke into compliance with the air and water quality regulations governing that location. As a result of the meetings and exchange of information between the parties, on February 13, 1970, with the consent of all parties, there was entered by the Department of Water Resources an Order setting a time schedule for implementation of a water pollution abatement program with respect to five general projects. In addition, the Order called for the evaluation and study of an ongoing problem dealing with color control, for which there was at that time no known solution, and specified that there would continue to be reports made with respect to the

company's ongoing abatement program and its
results. . . .

"Similarly, on June 25, 1970, the company and
the Division of Air Quality Control, with the
approval of the Department of Health and Mental
Hygiene, entered into a Plan for Compliance with
the Maryland air quality regulations by the mill at
Luke, which consists of approximately seven
pages. . . .

"Beginning immediately upon execution of the
Order and the plan, Westvaco began compliance
procedures. So far as is relevant to this case and so
far as the records of Westvaco disclose, . . . there is
set forth data which shows with respect to the
specific projects in the Order and the plan the
amount of money that was or is expected to be
spent with respect to a given project; the amount of
money which had been actually spent on that
project as of June 1, 1972 (the effective date of
certain amendments to the Act); August 28, 1973
(the date of the resolution hereinafter discussed);
and the date on which the project was or is expected
to be completed.

"In the summer of 1973, Westvaco Corporation
approached the Board of County Commissioners for
Allegany County and requested the Commissioners
to consider acting pursuant to [Code (1957, 1971
Repl. Vol., 1973 Cum. Supp.)] Article 41, Sections
266A-266-I, . . . (the "Act") by issuing bonds on
behalf of Westvaco to finance the pollution control
facilities which it had constructed and which it
proposed to construct in order to comply with the
plan and the Order. It was then anticipated that the
cost of facilities and the additional costs and
expenditures incident thereto would be
approximately $22,700,000.

"On or about August 28, 1973, after due
consideration, the Board of Commissioners of

Allegany County passed a resolution . . . in which it found that the issuance of revenue bonds as requested 'will facilitate and expedite the construction and acquisition of such pollution control facilities by the company' and that

The construction and acquisition of the facilities by the Company and the financing thereof by the County (a) promote the declared legislative purposes of the Act through furtherance of the control, reduction or abatement of pollution of the environment and (b) facilitate compliance with the requirements of federal, State and local laws and regulations governing the control, reduction or abatement of pollution of the environment, and thus (i) sustain jobs and employment opportunities and aid in maintaining employment, thus relieving conditions of unemployment in the State of Maryland and in the County; (ii) encourage the increase of industry and a balanced economy in the State of Maryland and in the County; (iii) assist in the retention of existing industry in the State of Maryland and in the County; (iv) promote economic development; (v) protect natural resources; and (vi) promote the health, welfare and safety of the residents of Allegany County, Maryland, and of the State of Maryland . . .

"Pursuant to the authority conferred in that resolution, the County has executed a Memorandum Agreement . . . in which the County undertook, subject to certain terms and conditions, to issue bonds pursuant to the above mentioned law in an amount not to exceed $22,700,000, to finance pollution control facilities as described on an exhibit attached to that memorandum. . . . [T]he estimated construction costs of facilities [were] broken into two categories: those which were

constructed or under construction and those which were in the planning stage and still subject to authorization. Note that the facilities in the planning stage are described in terms of pollution control objectives rather than in terms of equipment (with exceptions not relevant to this case).

"On June 4, 1974, William L. Wilson and Elizabeth G. Wilson, residents and citizens of Allegany County, filed the Petition for Injunction and Declaratory Relief in this case setting forth in paragraph 10 thereof multiple bases for their contention that the issuance of the bonds and expenditure of the proceeds as contemplated and set forth in the Resolution aforesaid and the Memorandum of Agreement aforesaid would violate State law, the State Constitution, and the Federal Constitution.

"Notice was given to the Attorney General of the State of Maryland by Petitioners as required by law, and in due course the State of Maryland filed a motion to intervene in support of respondents in which it alleged that

There is a strong Statewide public interest in implementing the particular resolution challenged in this action, and in other undertakings affected by construction of the enabling law, Sections 266A through I, Article 41, Annotated Code of Maryland. Such public interest relates to both environmental and economic concerns, and is expressed through programs of several State agencies.

On July 1, 1974, by Order, this Court authorized intervention by the State of Maryland in support of respondents.

"On or about July 3, 1974, the Mayor and City Council of Baltimore; Dover Poultry Products, Inc.;

SCM Corporation; and Allied Chemical Corporation filed a motion for leave to intervene in support of respondents in which it was alleged that each of the intervenors, with Baltimore City being representative of other municipalities, relied in the past and would rely in the future upon the validity of the legislation underlying the resolution of Allegany County and that in particular in Baltimore City, an adverse decision in the instant case would constitute a threat to the City's financing program for pollution control facilities. On or about July 3, 1974, this Court entered an Order permitting the aforesaid parties to intervene on behalf of respondents.

"The facilities which are to be financed by the bond proceeds were, with two exceptions to be discussed here, constructed or are to be constructed for the sole purpose of abating air or water pollution. These facilities will in no way increase the productive capacity of the plant, decrease the cost of the plant or increase the efficiency of the plant in any respect. In fact, were this not the case, the bond issue would not be entitled to the federal tax exemption which is the major if not sole purpose of the bond issue. Therefore, in this respect, the construction of these facilities generates no benefit to Westvaco or to Westvaco's stockholders or creditors since it consumes an enormous amount of capital and requires heavy expenditures for maintenance and operation and yet provides no increase in income or reduction in cost.

"The two exceptions to be noted are the recovery boiler and the coal washing machine. Recovery boilers have been used by pulp and paper mills for many years because it is in fact economically advantageous to recover and reuse the chemicals in the liquor cycle. In the instant case, however, there

were installed and operating at Luke two recovery boilers which were functioning satisfactorily from a production standpoint. There was no intent on the part of Westvaco to replace nor any benefit to be gained by Westvaco in replacing the existing recovery boilers. The replacement was done as an integral portion of several constructions designed to reduce the TRS emissions from the recovery boiler.

"To the extent that the new facility had a longer useful life than the old facilities and to the extent that the new facility had a larger capacity than the old facility, the construction of the new facility represented some benefit to Westvaco.

"At the federal level it has been necessary to pro-rate the construction cost in accordance with the regulations under § 103 of the Internal Revenue Code, allocating a certain proportion to pollution control and the remainder to increased capacity. The regulations permit the issuance of bonds with the exemption to the extent of an approved percentage. What that percentage will be has not yet been determined. A Revenue Ruling request has been submitted and is currently being reviewed. The proposal to the County as to the portion of the cost of the recovery boiler to be financed incorporates the anticipated result of the Internal Revenue Ruling Request in which it has been argued that approximately 60% of the cost of this new facility was due exclusively to pollution control.

"It is currently anticipated that the coal washing plant, if it is to be relatively efficient, must incorporate the economy of size. Currently it is anticipated that an economical size will mean the construction of a plant capable of processing more coal than the Luke plant currently requires. While this coal will be made available to the public at a competitive price, the moneys recovered from the

sale of this coal will not, under current or anticipated market conditions, the company contends, be sufficient to underwrite the cost of the facility. In other words, the facility would never have been constructed except to abate pollution. The operation of the coal washer will in no manner increase the productivity or efficiency of the production operation at Luke, and whatever income is generated from the sale of surplus coal will not be sufficient to offset the cost of operating the facility; hence, no portion of it could be used to amortize the capital expenditure.

"Thus, the construction of these facilities, except insofar as costs are specifically excluded from the bond proceeds, generates no benefit for Westvaco. Obviously then the company is investing an enormous amount of non-productive capital and is required to carry heavy interest payments in order to take the first steps into what will be a cleaner national environment. These steps are taken pursuant to orders or compliance plans which in general terms set forth the progress agreed upon between the State and the industry.

"The contemplated financing involves the issuance of pollution control revenue bonds by Allegany County, the proceeds of which will be lent to Westvaco. The revenue bonds are not an obligation of the County and will be repaid solely from loan repayments from Westvaco to Allegany County. Neither the full faith and credit nor the taxing power of the County is in any way pledged to the repayment of these bonds.

"Purchasers of the bonds rely solely on the credit of Westvaco for repayment. The purchasers in no way consider that the County is liable to repay the bonds. The issuance of these pollution control revenue bonds in no manner impairs or uses up the County's capacity to issue its own general obligation bonds."

# I
## Public Purpose

One of the arguments advanced by the County in response to Wilson's claim that the bond issue is invalid because of the lack of a sufficient public purpose is that the bond issue does not involve the use of public funds since it is not a general obligation of the County and is not payable out of the general revenues of the County, hence a public purpose is not required. The general rule that the public funds of municipalities cannot properly be devoted to a private use, even when expressly authorized by the Legislature, was noted by Judge Henderson for this Court in *Frostburg v. Jenkins,* 215 Md. 9, 14, 136 A. 2d 852 (1957). Wilson quotes Goldberg and Robinson, *Tax Exempt Financing of Industrial Development and Pollution Abatement Facilities* (1973):

> "It has been suggested that since revenue bonds do not involve a general obligation of the Issuer and are not payable out of the general revenues, such bonds do not necessarily have to serve a public purpose. This reasoning, however, has not been relied upon by any court in approving an issue of industrial development revenue bonds." *Id.* at 388.

We note that in the next succeeding paragraph it is stated:

> "A majority of the courts approve industrial revenue bond issues on the basis that industrial development serves a public purpose or on the basis that the legislature is the appropriate body to determine whether the purpose served by industrial revenue bond issues is a public purpose." *Id.* at 388.

We observe that by § 266C (c):

> "The principal amount of the bonds, the interest payable thereon, their transfer, and any income derived therefrom, including any profit made in the sale or transfer thereof, shall be and remain exempt from taxation by the State of Maryland and

by the several counties and municipalities of this State."

*See also* Code (1957, 1969 Repl. Vol., 1973 Cum. Supp.) Art. 81, § 280 (b). We further note that the rule in Maryland is that exemptions from taxation must be only for a public purpose. *Katzenberg v. Comptroller*, 263 Md. 189, 197, 282 A. 2d 465 (1971), and *Kimball-Tyler v. Balto. City*, 214 Md. 86, 97, 133 A. 2d 433 (1957). Therefore, we prefer to consider this matter assuming, but without deciding, that it is necessary that a public purpose be established.

D. Pinsky, *State Constitutional Limitations of Public Industrial Financing: An Historical and Economic Approach*, 111 U. Pa. L. Rev. 265 (1963), states:

"The majority of decisions have sustained the validity of the revenue bond plans under the public aid limitations and the public purpose test. The courts have held that a statute which pledges only project revenues does not pledge the public credit, and therefore does not lend the public credit in aid of anyone. The public purpose test and the public aid limitations have been identically treated. Of the four courts that invalidated revenue bond statutes, two relied on both the credit clause and public purpose test, one on the credit clause alone, and one on the public purpose test alone.

"These minority courts and law review commentators have asserted that several factors justify the invalidation of revenue bond statutes under the credit clause and the public purpose test. Public officers who administer the plans must perform various duties similar to those of the mortgage trustee, including fixing and collecting rentals and providing insurance coverage. It is alleged that it is improper for them to be so occupied. If so, taxpayers have a valid interest in the proper use of officers' time. Further, the use of officers' time can be translated into an expenditure

of public funds — a given percentage of their salaries. In addition, improper performance of their duties by municipal officers may create municipal liability to bondholders or others. Even if that does not occur, a default by the lessee might produce a default on the bonds which would adversely affect the city's credit status." *Id.* at 315.

The bonds to be issued here will require payment by the Company to a trustee who, without expense to the County, will disburse the required payments on the bonds to those entitled to receive them. This procedure effectively negates all such objections in this case other than the last objection.

Citing *Lerch v. Md. Port Authority,* 240 Md. 438, 214 A. 2d 761 (1965), 15 E. McQuillin, *Municipal Corporations* (J. Latta 3d ed. 1970 rev. vol.) § 43.29 states:

"The legislature may determine whether or not the object for which bonds are to be issued is a municipal purpose, and its determination will not be disturbed unless clearly wrong." *Id.* at 519.

*Lerch* involved the validity of a proposed issue of revenue bonds by the Maryland Port Authority for the acquisition and construction of an international trade center in the port of Baltimore. The statement by McQuillin is in fact the gist of the holding in *Lerch.* C. Antieau, *Municipal Corporation Law* § 15.04 (1973), states:

"There is no satisfactory test or definition of what is a 'public purpose' for which local governmental bonds can be issued. The Maryland court once said: 'What is a public purpose for which funds may be expended is not a matter of exact definition; it is almost entirely a matter of general acceptance.' Later the same court, in sustaining a municipal bond issue to construct a factory to house new industry, indicated that the line between public and private purpose is not static. It stated: 'The line of demarcation is not immutable or incapable of adjustment to changing social and economic

conditions that are properly of public and governmental concern.' " *Id.* at 15-11.

The last Maryland reference is to *Frostburg v. Jenkins*, 215 Md. 9, 16, 136 A. 2d 852 (1957), relied upon by Judge Oppenheimer for the Court in *Lerch*. The other reference by Antieau is to *Finan v. M. & C. C. of Cumberland*, 154 Md. 563, 565, 141 A. 2d 269 (1928), an opinion by Chief Judge Bond quoted for the Court by Judge Henderson in *Frostburg*. The legislative findings of the County Commissioners of Allegany County are set forth in the portion of the trial judge's opinion we have quoted. The legislative findings of the General Assembly are found in § 266B (a) of the Act which we have quoted.

It is possible that at an earlier time in our history elimination of air and water pollution might not have been regarded as a public purpose, but times and conditions do change. The writer of this opinion remembers when a 10-hour, 6-day workweek prevailed for his father and others employed in industry in his community. A proposal in peacetime for such a workweek today would horrify society. There are also those who can remember when it was believed household sewage was adequately, properly, and sanitarily disposed of when emptied into an adjoining stream. Reference was made in *Schlosser v. Creamer*, 263 Md. 583, 585, 284 A. 2d 220 (1971), to a 1925 deed to a lot in Baltimore City that included "restrictions against . . . the keeping of swine and specifications as to the distance from any street for the erection of any stable," both of which restrictions would be regarded as unnecessary in most municipalities today. Electric lines servicing homes outside incorporated towns or other built up areas did not come to many of the rural areas of this State until after the end of World War II. Prior to that time deeds can be found on record with a provision that any privy built on the land conveyed should "be built with tight oil casks and [were] to be bricked or cemented so that there [should] be no leakage," a type of waste disposal that no doubt would horrify the Department of Health today. In the not too distant past it

was thought necessary to specify by ordinance the size and type of container in which one might place ashes for municipal collection, but today a householder would have to search arduously to find a supply of coal if he wished to heat his home with that fuel. Until very recently, a common method of disposing of trash or unwanted materials was open air burning, a now forbidden practice in many areas. Our laws relative to riparian rights have been changed, brought about to a large degree by environmental concerns. See the able review of those changes for this Court by Judge Finan in *Board of Pub. Works v. Larmar Corp.*, 262 Md. 24, 35-55, 277 A. 2d 427 (1971); *Potomac Sand & Gravel v. Governor*, 266 Md. 358, 364-66, 293 A. 2d 241 (1972); and *Williams v. Skyline Dev. Corp.*, 265 Md. 130, 155-161, 288 A. 2d 333 (1972). Devices restricting the polluting effect of automobile exhausts have been required notwithstanding the fact that these devices have reduced the economy of operation of the average motor vehicle.

A. Early, *Financing Pollution Control Facilities Through Industrial Development Bonds*, 27 Tax Lawyer 85 (1973), states:

"The Environmental Revolution is upon us. Many elements of our society are avidly interested in ecology and serious in their concern over the relationship of a favorable environment to health and welfare. This has come through to our legislators and other public representatives. The result is a plethora of statutes, regulations, surveys, reports, speeches, articles and press releases which show every evidence of increasing at an accelerating rate. . . .

* * *

"Legislation directed to pollution control has been on the books throughout this century. However, the birth of the Environmental Revolution can be marked with the enactment of the National Environmental Policy Act of 1969

(NEPA). The demise of the revolution is yet to be seen, even on a clear day." *Id.* at 85.

The interest of vast portions of our populace in matters of environment is well illustrated by the statement in 61 Am.Jur.2d *Pollution Control* § 4 (1972):

> "Concern for the environment is now sweeping the country, and Americans have become increasingly aware of the part the natural environment plays in determining the quality of their lives. Although formerly the meaning of the term 'ecology' was known only to a few, it has now become a household word. Politicians and statesmen have espoused the cause of environmental quality; radio, television, magazines, and newspapers give prominence to the subject; it has been the subject of a number of symposiums; and companies allegedly responsible for pollution are spending large sums of money for advertisements designed to show that they are blameless or are improving the environment. Private citizens, civic organizations, and communities are now organizing and speaking out. This participation in environmental protection is being championed at the highest levels of government, and conservation literature contains publications setting forth the guidelines for activists. Citizen participation frequently takes place through local organizations, conservation commissions, conservation councils, and professional groups. Also, a number of organizations, with large memberships of citizens from all parts of the nation, exist to inform, guide, or represent their members in a wide variety of environmental and conservation matters, and occasionally national environmental organizations join other interested citizens to form a temporary, nationwide coalition to take a position or action on an important environmental issue. Environmental

law societies, which are active in promoting the cause of environmental quality, have been formed in many of the law schools throughout the country." *Id.* at 813-14.

The test to be applied by a court in reviewing the action of a public body to determine whether a public purpose is involved in a proposed expenditure of public funds was set forth for the Court by Judge Barnes in *Williamsport v. Sanitary District,* 247 Md. 326, 231 A. 2d 40 (1967):

"[I]n the case at bar, we believe the purchase by the Town of immunity from a possible threat to the health and welfare of its residents is not an *ultra vires* or an unconstitutional act. We do not consider, in reaching this conclusion, if the threat posed by locating the treatment plant at the original site was, in fact, real and imminent or illusory and without substance. In reviewing the Town's action, it is only necessary that the legislative determination to spend a particular amount of public funds be reasonable and based on an honest judgment of those officials charged with care of the public purse that the expenditure is for the best interests of the city." *Id.* at 332.

The increasing involvement of many of our states in promoting industrial development is well illustrated by J. Harwell, *Lawyers and State Development Agencies,* 60 A.B.A.J. 1098 (1974), and the accompanying list of development agencies in Puerto Rico, the Virgin Islands, and each of the 50 states. In the quest for jobs to maintain full employment some communities have come to recognize that it is important to keep healthy industry already located in their community, one of the legislative purposes set forth in § 266B (b) of the Act. It is interesting in this regard to note that Harwell states:

"Industrial expansion is a primary source of new jobs in all communities and states. In Texas the governor recognizes expanding industries in a

special conference with awards once a year. Texas and many other states do this to let those existing industries know they were not forgotten when they settled but are still important cogs in the growth of all our communities.

"It is all too easy to go to ribbon-cutting ceremonies when a new plant opens its doors and then wander off seeking a new industry, forgetting that this plant and its contributions to any community are vital to all.

"There are no reasons to oppose new industry. Many fight it in the name of ecology and the elusive 'no-growth' concept. First, no new industry is a polluter. States have laws ensuring the air and water will be clean and agencies to enforce these laws. All new plants must be built to meet these laws. Second, it's not 'no-growth' we are worried about. It is keeping up with existing growth. Remember those two million nineteen-year-olds coming into the labor market in 1975? We must provide for them." *Id.* at 1099.

It is true, as contended by Wilson, that some courts have held that pollution abatement alone is not a sufficient public purpose to justify the issuance of municipal revenue bonds for the use of private industry. We believe, however, that the public interest is served by the abatement of air and water pollution. This is in accord with what we conceive to be the better reasoned opinions. *See, e.g., Industrial Develop. Auth. of Cty. of Pinal v. Nelson,* 109 Ariz. 368, 509 P. 2d 705, 711 (1973); *Opinion of the Justices,* 359 Mass. 769, 772, 268 N.E.2d 149 (1971); *Fickes v. Missoula Co.,* 155 Mont. 258, 268, 470 P. 2d 287 (1970); *State ex rel. Brennan v. Bowman,* Nev., 512 P. 2d 1321, 1322 (1973); *Kennecott Copper Corporation v. Town of Hurley,* 84 N. M. 743, 507 P. 2d 1074, 1076, 1077 (1973); *Harper v. Schooler,* 258 S. C. 486, 496, 189 S.E.2d 284 (1972); and *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 57, 205 N.W.2d 784 (1973).

In this case there is a legislative mandate, § 266B (f), that

the findings of the legislative body are to be conclusive. Legislative findings have been duly made. We conclude that the General Assembly and the County Commissioners of Allegany County did not err when they determined that a public purpose is indeed served when industry already located in a community is assisted, as in this case, to abate air and water pollution, thus making life more pleasant for the citizens and the taxpayers of the area while tying the industry more closely to its present location, thereby assuring its continued presence in the State and the County.

## II

### Public purpose when industry already under orders to construct facility

Wilson points out that in this instance the Company was under orders to install this equipment. He argues that this fact negates a finding of public purpose for the issuance of these revenue bonds. We do not see it that way. It is conceded that pollution abatement equipment is very expensive. It likewise is conceded that without present environmental concerns the pollution abatement equipment would not have been installed. The trial judge made findings of fact that these facilities "will in no way increase the productive capacity of the plant, decrease the cost of the plant or increase the efficiency of the plant in any respect" and that "the construction of these facilities generates no benefit to Westvaco or to Westvaco's stockholders or creditors since it consumes an enormous amount of capital and requires heavy expenditures for maintenance and operation and yet provides no increase in income or reduction in cost." There was evidence adduced to support those findings. They are not disputed. However, whether benefit will accrue "to Westvaco or to Westvaco's stockholders or creditors" is not a critical factor. What is critical, as we see it, is use of the concept that oftentimes more co-operation can be obtained toward reaching a given goal by the use of persuasion rather than coercion. It has been said that more flies can be

attracted with a sweet substance than with vinegar [1] and that "[t]here are more ways of killing a cat than choking her with cream." [2] We understand the combined effect of the Act, the action of the County Commissioners, and the tax advantages permitted pursuant to applicable federal statutes and regulations, which we shall hereafter discuss, were intended to be an implementation of that philosophy. We see no impropriety in the use of this approach. It does not in our view negate a finding of a public purpose for the issuance of the bonds.

## III

### Facilities begun before the effective date of statute and resolution

Wilson contends that the loan proceeds may not validly be applied to the refinancing of pollution abatement facilities acquired prior to June 1, 1972, the effective date of Chapter 352 of the Acts of 1972 which placed specific reference to pollution control facilities in § 266A. He similarly contends that the proceeds may not be used to finance work done prior to the passage of the resolution by the County on August 28, 1973.

Section 266A (d) states that "[t]he term [pollution control facilities] includes any pollution control facilities utilized by any public service company as defined in Article 78 of this Code and *includes but* shall not be limited to pollution control facilities which can be financed by bonds determined to be tax exempt under provisions of the Internal Revenue

---

1. "More flies are taken with a Drop of Honey than a Tun of Vinegar." Thomas Fuller (1654-1734), Gnomologia.

"Strive not to hew your path
    through life — it really doesn't pay;
Be sure the salve of flattery soaps
    all you do and say;
Herein the only royal road to fame and
    fortune lies;
Put not your trust in vinegar —
    molasses catches flies!"

Eugene Field (1850-1895), Uncle Eph., stanza 4.
2. Kingsley, Westward Ho, ch. 20.

Code of 1954," the italicized portion having been added by Chapter 396 of the Acts of 1973. In divining the legislative intent of the General Assembly of Maryland, we thus must focus our attention upon the Internal Revenue Code. Although there has been a shift in the exemption from federal taxation accorded interest on industrial development bonds as pointed out by A. Early, *op. cit.* 91, § 103 (c) (4) provides for exemption of interest on such bonds connected with air or water pollution control facilities. Treas. Reg. § 1.103-8 (a) (5) (1972) limits the application of that exemption to those bonds issued to finance facilities commenced after September 2, 1972, if the authorizing resolution or ordinance was adopted prior to the issuance of the bonds, with one limited exception. The present regulations permit pollution control revenue bonds (PCRB's) to be issued to finance facilities whose construction commenced prior to September 2, 1972, only if the bond-authorizing ordinance or resolution is adopted "prior to the date the entire facility is first placed in service." Treas. Reg. § 1.103-8 (a) (5) (ii) (1972). Thus, in the case at bar, the Company's facilities are eligible for financing by PCRB's which probably will enjoy the federal tax exemption because the resolution was adopted prior to the date the entire facilities have been "placed in service." The term "placed in service," according to those regulations, "shall not be earlier than the date on which —

"(a) It has reached a degree of completion which would permit operation at substantially the level for which it is designed, and

"(b) It is, in fact, in operation at such level."

Accordingly, there is a definite limitation on the issuance of PCRB's under the Act. As a practical matter, no bonds will be issued under the Act unless the federal income tax exemption is available. If the exemption is not available, use of the Act would only complicate an already complicated transaction by involving a political subdivision without purpose.

The quoted regulations represent a reasonable effort on the part of the Treasury Department to deal with the

transition period between the time preceding September 2, 1972, when there were no clear precedents and only proposed regulations, and the time following September 2, 1972. The Treasury no doubt thought it would be unfair and arbitrary simply to select a date such as September 2, 1972, and preclude the issuance of PCRB's to finance facilities commenced prior to that date. Accordingly, the "transition" regulation was adopted. Indeed, the Internal Revenue Service contemplated the replacement of "temporary" or "construction" financing with the permanent financing provided by the proceeds of the tax-exempt bonds. In the case of pollution control facilities, the construction of which was commenced on or after September 2, 1972,

> "[t]emporary construction or other financing of a facility prior to the issuance of State or local governmental obligations to provide such a facility will not cause such facility to be one which is not described in this subdivision." Treas. Reg. § 1.103-8 (a) (5) (iii) (1972).

It was in the light of the regulations adopted in 1972 that the General Assembly again amended § 266A in 1973. The original definition of "pollution control facilities" was phrased in such a manner so as not to be limited by the tax-exempt status of the bonds. The 1973 amendment, however, expressly provided that, at a minimum, the term "pollution-control facilities" was to include pollution control facilities which could be financed by tax-exempt bonds under the Internal Revenue Code. In other words, by expressly incorporating by reference the Internal Revenue Code of 1954, the General Assembly assured that the definition of pollution control facilities would include all facilities which could be financed with tax-exempt bonds under the Internal Revenue Code and its pertinent final regulations, thus assuring the same treatment at both state and federal levels for facilities under construction before September 2, 1972.

It is said in Goldberg and Robinson, *op. cit.*:

> "Basic to any discussion is whether the industrial

revenue bond act in any particular state allows a municipality or authority (the 'Issuer') to issue industrial revenue bonds to finance a project that is under construction or which has already been constructed. In a number of states the act specifically provides that the Issuer can refinance existing facilities if such refinancing is deemed by the Issuer to be in the public interest. In most states, however, such a conclusive provision is not present. Frequently, though, the Issuer is authorized to issue industrial development revenue bonds to 'acquire' existing facilities. This provision has been deemed broad enough to allow the Issuer to acquire facilities at any stage of construction, *White v. City of Hickman*, 415 S.W.2d 379 (Ky. 1967) or after construction is complete, *Nuessner v. McNare*, 157 S.E.2d 410 (S. C. 1967). The authority to provide such financing is limited, however, by the requirement that such financing must serve a 'public purpose.' *Manning v. Fiscal Court of Jefferson County*, 405 S.W.2d 755 (Ky. 1966)." *Id.* at 386-87.

It is to be noted that the Maryland statute refers to "acquisition."

We find persuasive the language of the South Carolina Court in *Nuessner v. McNair*, 250 S. C. 257, 157 S.E.2d 410 (1967):

"The question for decision here is whether it was the intention of the Legislature that the benefits of the [Industrial Revenue Bond] Act were available to industries which might have located in South Carolina prior to the passage and effective date of said Act but whose projects were not then completed or financed." *Id.* at 260.

* * *

"The Legislature, in authorizing the several counties of this state to exercise the powers

delineated in Section 3 of the Act, did not limit the counties to the acquisition of a project which had been commenced after the effective date of the Act. There is no reference in the Act as to when a project must be commenced before a county is authorized to acquire it. It seems to us that if the Legislature intended to deny to the counties the right to acquire projects commenced before the effective date of the Act, it would have expressly so stated. It is our conclusion that the Legislature intended the benefits of the Act to be as far-reaching as possible and that the time of the commencement of the construction of a project had no significance as to whether the provisions of the Act were available if the projects were essential to the state's economy and the welfare of its people. The effective date of the Act, in our opinion, applies solely to the time when the county could exercise the powers therein granted." *Id.* at 262-63.

Similar logic is applicable to the contention relative to facilities constructed before the passage of the County's resolution.

## IV

### Facilities in Garrett County and West Virginia

It is suggested that because a part of the facilities here involved are to be located across the Potomac River in West Virginia and because the coal washing facility to be erected is to be placed in Garrett County, that these bond proceeds may not be used. *Grinnell Co. v. City of Crisfield,* 264 Md. 552, 287 A. 2d 486 (1972), arose under an earlier version of this same statute. When it was there contended "that since the Rubberset plant was located outside of the City limits of Crisfield, the City [might] not claim that the plant addition served a public purpose for that City," Judge Finan observed for this Court that the appellant had "placed too strict a construction on what [might] be a valid public purpose for a city under the Act." He further said:

"The applicable provisions of [the Act] contain no such geographic limitation on the location of a project and we feel that to judicially draft one would be contrary to the intent of the legislature, since the stated purpose of the statute is not only to encourage the increase of industry, but also to relieve conditions of unemployment. It is, we believe, entirely likely that persons residing within the City limits of Crisfield will seek employment outside of those limits, within the immediate vicinity of the community and probably at the Rubberset plant." *Id.* at 559.

In this case the trial judge, after referring to *Grinnell,* said:

"Similarly, in the present case Westvaco will enhance Maryland's public interest with its West Virginia and Garrett County equipment which will facilitate a cleaner environment for Maryland and Allegany County. The constitutional requirement of a public purpose is therefore served.

"In his treatise, *Municipal Corporations,* McQuillin supports the Court of Appeals' position in *Grinnell.* Discussing the public purpose doctrine, McQuillin says:

'The fact that the indebtedness is to be incurred in connection with municipal improvements outside the territorial limits is immaterial. Thus, indebtedness may be incurred in the purchase of lands or the making of improvements outside the territorial limits of the municipality where it is for the common benefit and enjoyment of all the citizens of the municipality . . .' McQuillin, *Municipal Corporations,* Section 39.21 (1970).

See also *id.* Section 43.33 ('[p]ublic improvements, including improvements outside the municipal

58

limits, constitute a purpose for which municipal bonds may be issued')."

His finding of fact was not clearly erroneous. Since there was no limitation of law applicable, that finding must stand. Rule 886.

*Decree affirmed; appellants to pay the costs.*