## TOWN OF WILLIAMSPORT *v.* WASHINGTON COUNTY SANITARY DISTRICT

[No. 510, September Term, 1966.]

*Decided June 30, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER, BARNES, McWILLIAMS and FINAN, JJ.

*H. Warren Buckler,* with whom were *Charles F. Wagaman* and *Wagaman, Wagaman, Meyers & Hanover* on the brief, for appellant.

*K. J. Mackley* and *Edward W. Gilbert, Jr.,* with whom were *Ottinger, Mackley & Gilbert* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

This is an appeal by the Town of Williamsport (Town) from a declaratory decree of the Circuit Court for Washington County (Rutledge, J.) ruling that the Town is bound by a contract made with the appellee, Washington County Sanitary District (District), to pay the sum of $50,000 and to furnish it certain services. By the contract, the District agreed to relocate a proposed sewage treatment plant from a location up-water and to the north of Williamsport on the Conococheague Creek to a location on the Potomac River below and to the southeast of Williamsport.

The Town of Williamsport is a municipal corporation exercising general municipal powers in a defined area in Washing-

ton County pursuant to a home rule charter adopted in 1957. The appellee District is an administrative agency of the County Commissioners of Washington County, created by Acts of 1957, ch. 694, as amended by Acts of 1961, ch. 743, to construct, maintain and operate sanitary facilities in subdistricts in Washington County established pursuant to such acts.

The facts of the case have all been stipulated.

In 1963, the District established a sanitary subdistrict in the developed portion of an area, known as Halfway, lying between Hagerstown and Williamsport and proceeded with plans for the construction of a sewer system and sewage treatment plant to serve the subdistrict. Upon completion of these plans, the District applied to the State Department of Health for a permit to construct a treatment plant which would discharge effluent into Conococheague Creek at a point one-half mile above the Town. This Creek runs through the Town from the north, emptying into the Potomac River just to the south of the Town. The Town maintains a large park and recreation area, known as River Park, along the banks of the Creek. Most of the residential area of the Town lies to the north, not far from the Creek.

The proposed sewage treatment plant, to be located just beyond the northern corporate limits of the Town, was designed to provide both primary and secondary treatment of the sewage flowing into the plant and was designed to serve the Halfway Subdistrict, all of which was outside the corporate limits of the Town.

Town officials believed that odors from the plant itself, odors from the effluent discharged into the Creek and sludge deposits on the park beaches might damage the Town's residential area and its park.

Notice of application for the permit was duly published in the Hagerstown newspapers and, in timely fashion, the Town requested a hearing before the State Department of Health. Despite this request, the Department issued the permit without granting the Town a hearing. On January 7, 1964, the Town appealed the decision of the Department to the Circuit Court for Washington County, presumably pursuant to the authority of Maryland Code, Article 43, section 404 (1965 Repl. Vol.). After

hearing argument, the court remanded the question of the issuance of the permit to the State Department of Health for further consideration.

Following the remand, a meeting was held with the Bureau of Environmental Hygiene of the Health Department. At this meeting, the Town proposed that the type and location of the proposed treatment plant be changed from a secondary type plant emptying into Conococheague Creek to a primary type plant located to the south of the Town and emptying into the Potomac River. The Department endorsed this proposal and encouraged the Town and the District to develop a solution along those lines. While subsequent meetings between the parties took place, the Town authorized a firm of consulting engineers to prepare a study of the alternate plan proposed by the Town, including especially a study of comparative costs between the proposal of the District and the alternate proposal of the Town. This report was submitted July 20, 1964.

The report points out that the proposed plant would serve none of the residents of the Town and that the Town's recently constructed sewage treatment plant was adequate to take care of its needs and could be expanded if necessary. The report further compared the costs of the original and alternate proposals, indicating that the construction cost to the District of the alternate plant would be greater by approximately $166,000, but that the operating cost would be substantially less, so that the net annual increase in cost to the District, including operation and debt amortization, would be approximately $3,100.

Despite the report and recommendations of the Town's consulting engineers, the controversy continued unresolved. During the course of numerous negotiating sessions, the County Commissioners of Washington County apparently agreed to absorb the cost of engineering for the proposed alternate plant, thereby reducing the increase in cost to the District to an estimated $144,000, with a corresponding reduction in annual operating and debt amortization charges.

It was not until December, 1964, that the negotiating parties reached an agreement which they were prepared to recommend and this agreement was embodied in a written instrument to be submitted to the governing bodies of the parties.

This instrument, which is at issue in the case, provides that the Town will pay the District the sum of $50,000 toward the increased cost of constructing the District's treatment plant at the alternate site and will, in addition, provide the services of an employee at the new plant for approximately 800 hours per year. In consideration of these agreements, the District agreed to provide the Town such supplementary sewerage service "as may be economically feasible, at a rate that would be mutually advantageous, taking into consideration all costs involved."

On January 4, 1965, an ordinance was introduced in the Williamsport Town Council to approve the agreement. With the Mayor casting a vote to break a tie between an equally divided Council, the ordinance was approved on February 1, 1965. Subsequently, petitions for a referendum on the ordinance were filed with the Council of the Town. After due notice and public hearing, the ordinance was approved by about 70% of the votes cast at the referendum election. The amount of the proposed expenditure was not mentioned either in the notice of referendum or in the question referred.

An election for mayor and council was held the following month. When the time came for the new administration to appropriate funds to meet the Town's obligation under the contract, bond counsel for the Town expressed doubt in regard to the validity of the contract. Meanwhile, construction on the alternate plant had been started in April, 1965, and was approximately 40% complete when the Town notified the District that it had been advised that it could not legally carry out the provisions of the contract.

The Town contended before this Court that the contract is void and unenforceable, resting its argument on three grounds: (1) that the only benefit accruing to the Town which is not illusory or is not so vague as to be unenforceable is the assurance that the Town would not be exposed to damages from the treatment plant as originally proposed; (2) that the contract is *ultra vires* the Town because the Town lacked the power to enter into the agreement by which its only benefit would be the change in the plant's location; and (3) that the District abused its powers in requiring the Town to pay it for changing the site of the proposed plant. The District challenged the correctness of

these contentions and claimed, in addition, that the Town is estopped to deny the validity of the contract.

## 1.

The Town submits that the covenant of the District to render "supplementary sewerage service" is "mere window dressing involving no obligation on the part of the District greater than its obligation as a public utility under the law and that, accordingly, the contract must be construed simply as an agreement on the part of the town to pay public funds and assign a public employee to the District in order to induce the District to abate a potential threat to the health and welfare of the town by relocation of the District's sewage treatment facility."

We may assume, *arguendo,* that the contention of the Town is correct on this point. The contract was still valid and enforceable, however, because, in our opinion, the expenditure of public funds by the Town to achieve the removal of the treatment plant to the alternate site was not beyond the powers of the municipality.

## 2.

Under the broad powers of its Charter, adopted in 1957, the Town is expressly authorized "to expend municipal funds for any public purpose." This power is extensive, limited only by the Constitutional restriction imposed by Article 15 of the Declaration of Rights that taxes must be laid (and public money spent) "with a political view for the good government and benefit of the community." See *City of Frostburg v. Jenkins,* 215 Md. 9, 16, 136 A. 2d 852 (1957); *Finan v. Mayor and City Council of Cumberland,* 154 Md. 563, 141 Atl. 269 (1928). In *Frostburg,* we noted that, "with due regard to the legislative prerogative, the courts have a duty to determine whether the particular use is within the scope of the constitutional power." 215 Md. at 16, 136 A. 2d at 855. In sustaining an enabling act and city ordinance which authorized the use of public funds to finance the construction of buildings to be sold to manufacturing companies, we held that the purpose of the expenditure, to encourage industrial development in the city, had "a substantial relation to the public welfare and can fairly be said to serve a public purpose * * *." 215 Md. at 19, 136 A. 2d at 857.

Likewise, in the case at bar, we believe the purchase by the Town of immunity from a possible threat to the health and welfare of its residents is not an *ultra vires* or an unconstitutional act. We do not consider, in reaching this conclusion, if the threat posed by locating the treatment plant at the original site was, in fact, real and imminent or illusory and without substance. In reviewing the Town's action, it is only necessary that the legislative determination to spend a particular amount of public funds be reasonable and based on an honest judgment of those officials charged with care of the public purse that the expenditure is for the best interests of the city.

Thus, in *Board of County Comm'rs v. MacPhail*, 214 Md. 192, 133 A. 2d 96 (1957), we held it was not *ultra vires* for the Harford County Commissioners to contract to pave a portion of a county road running through the complainant's farm since the Commissioners had a reasonable basis to believe that the complainant would bring suit if the road were not paved. It did not matter, in *MacPhail*, whether the threatened suit was, in fact, groundless or valid or whether a less expensive settlement could have been reached. The test is the reasonableness and the honesty of the legislative judgment that public benefit will result from the expenditure and that the benefit is worth the amount spent. See also, *Huffman v. State Roads Comm'n*, 152 Md. 566, 137 Atl. 358 (1927) ; *Riggs v. Winterode*, 100 Md. 439, 59 Atl. 762 (1905) ; cf. *George A. Fuller Co. v. Elderkin*, 160 Md. 660, 154 Atl. 548 (1931).[1]

In attacking the validity of its own action, the Town is placed, therefore, in the curious position of claiming that both its decision to spend and the amount determined to be spent are unreasonable. To be successful, the Town must rebut the presumption of validity which attaches to the exercise of the police power by a municipal corporation. *Town of Bladensburg, Inc.*

---

1. Some of the authorities cited relate to counties rather than municipal corporations; but these are in point because the county commissioners are considered as a municipal corporation for purposes of defining their powers. Montgomery County v. Maryland-Washington Metro. Dist., 202 Md. 293, 304, 96 A. 2d 353 (1953); Neuenschwander v. Washington Sanitary Comm'n, 187 Md. 67, 48 A. 2d 593 (1946).

*v. Berg,* 216 Md. 292, 139 A. 2d 703 (1958); *Maryland Advertising Co. v. Mayor & City Council of Balto.,* 199 Md. 214, 86 A. 2d 169 (1952). See also *Mayor and City Council of Rockville v. Brookville Turnpike Construction Co., Inc.,* 246 Md. 117, 228 A. 2d 263 (1967). In our opinion, there is no merit to the Town's contentions.

It was not shown to any extent that no damage would have resulted to the Town if the treatment plant had been constructed as originally proposed. On the contrary, it is clear that the Town had reasonable grounds for believing a plant located on Conococheague Creek would be injurious to its inhabitants and property. It is apparent from the opinion of the lower court, that the Town, prior to entering into the contract, had authorized a competent engineering firm to study the proposed location of the original site and the possible effects upon the health and welfare of its citizens. We cannot say the Town's decision was based on other than objective study and extrinsic fact.

Nor was it shown that the Town could have, at less expense, enjoined as a nuisance the construction of the treatment plant at the original site. In any event, besides the obvious advantage of avoiding the vagaries of a nuisance suit, the Town was advised, by an engineering report dated July 10, 1964, that corollary benefits would accrue to it from the alternate site. This report stated, in part:

> *"Advantages of the Alternate Plan*
>
> "In addition to the advantage of reducing odor and sludge deposit problems feared by the Town, the alternate project would have corollary advantages.
>
> "The Town plans the construction of a pumping station in the vicinity of the drive-in theater to serve the Clifton Drive area; this pumping station will discharge through a force main into sewers in U. S. 11 to the southwest. Should this project be constructed, the force main will pass adjacent to the pumping station site and sewage can be pumped directly into the large main eliminating the need for the Town's force main in U. S. 11. We estimate that this change would save the Town about $10,000 in initial project costs.
>
> "At some time sewage facilities must be provided for

[certain] drainage areas * * *. We understand no plans have been made by the Sanitary Commission for providing these sewers and that the Town does not contemplate annexation of the provision of utility services beyond I-81. Since an extensive industrial park is planned in this area, the need for these facilities may develop in the near future. If an alternate project were constructed, sewage could be pumped from these drainage areas directly into the force main. This solution would be less expensive than either of the two alternatives. * * *."

Under these circumstances, we cannot find that the Town acted unreasonably in agreeing to pay the sum contracted for, even assuming the construction of the plant at the original site could have been enjoined.

## 3.

Finally, the Town urges that the District disregarded its "fundamental obligation to the total public welfare" in choosing a plant site on Conococheague Creek which might harm the Town. It is argued that an equity court should not force the Town to honor the contract because the District should not have insisted "on a financial contribution toward the increased cost of the alternate site so as to minimize the burden on people directly benefited." We cannot agree with this contention. Through court proceedings, the Town made sure that the District did not obtain a permit from the State Department of Health to construct the plant on Conococheague Creek until there had been a full hearing, at which the Town had the opportunity to present its objections to the original project. The Department, which is charged with correcting and preventing pollution of waters in the State, granted the permit, and the Town did not appeal the order on the ground that it was unreasonable or illegal. Code, Article 43, section 404 (1965 Repl. Vol.). The Town cannot, in effect, challenge the propriety of that order in this case. In any event, we conclude that there was nothing inequitable in the District's requiring payment by the Town to help offset the greater cost of the alternate project, which amounted to $3,100 annually over a period of 30 years.

In view of our decision, it is unnecessary to consider the question of estoppel.

*Decree affirmed; costs to be paid by appellants.*