PEDRO J. REYES ET UX. *v.* PRINCE
GEORGE'S COUNTY ET AL.

[No. 51, September Term, 1977.]

*Decided October 31, 1977.*

280

The cause was argued before Murphy, C. J., and Singley, Smith, Digges, Levine, Eldridge and Orth, JJ.

*Josef B. Brown* and *Richard C. Daniels,* with whom were Reichelt, Nussbaum, Brown & Topf on the brief, for appellants.

*Amicus curiae* brief filed by State of Maryland, *Francis B. Burch, Attorney General, George A. Nilson, Deputy Attorney General,* and *Michael J. Milton, Assistant Attorney General,* on the brief.

*James C. Chapin, County Attorney,* for appellee Prince George's County. *Roger D. Redden,* with whom were *Henry R. Lord, W. Gar Richlin, Piper & Marbury, Ellis J. Koch* and *O'Malley, Miles, Farrington & McCarthy* on the brief, for appellee Washington National Arena Limited Partnership.

DIGGES, J., delivered the opinion of the Court. MURPHY, C. J., and ELDRIDGE, J., filed an opinion concurring in the judgment at page 308 *infra.*

While this suit appears from the record to be only a mundane challenge by appellant-taxpayers to the proposed issuance and sale of revenue bonds by appellee Prince George's County, and the intended loan of the bond proceeds to appellee Washington National Arena Limited Partnership, it raises, by the circumstances of its initiation and prosecution, questions of far greater concern, at least to this Court, than those actually presented by the parties for our determination. We defer for the moment a fuller statement of the facts relevant to the merits of the case, addressing first the question whether the suit is collusive. We conclude that, although it is indeed dismissible on that ground, we are not constitutionally bound to dismiss it and, under the circumstances present here, decline to do so; in addition, we establish with this case specific conditions and procedures under which, in the discretion of the court, actions of sufficient public concern, involving a governmental body, or an agency or official thereof, may be adjudicated despite their collusive nature.

## I. Jurisdictional Considerations

In response to interrogation by members of this Court at oral argument, counsel for the first time since inception of

these proceedings disclosed, in effect, that this suit was initiated by appellee Washington National Arena solely to satisfy The Equitable Life Assurance Society of the United States, a prospective bond purchaser, as to the legality of bonds being issued to refinance the arena's existing indebtedness. From counsel's statements, it appears that the arena, a nongovernmental business entity, engaged and compensated counsel for then-unselected nominal plaintiffs, and through that counsel obtained the services of the plaintiff-appellants to sue itself in order to secure an opinion of this Court concerning the validity of the proposed bond issue. On that account, we can only conclude that the suit is a collusive one, not involving the " 'actual antagonistic assertion of rights' to be adjudicated — a safeguard essential to the integrity of the judicial process . . . ." *United States v. Johnson,* 319 U. S. 302, 305, 63 S. Ct. 1075, 87 L. Ed. 1413 (1943). Consequently, it is plain that the adjudication below may be set aside and the cause dismissed without entering judgment on the merits.

We begin by pointing out what is known to every student of our judicial process: that the American system of adjudication from its inception has been grounded on the principle that adversary presentation of issues actually in dispute between the parties to the suit plays a vital and essential role in attaining justice. *See* Neef & Nagel, *The Adversary Nature of the American Legal System from a Historical Perspective,* 20 N.Y.L.F. 123, 123-126 (1974). It should be obvious to all that this role is undermined when a defendant selects a plaintiff to sue him, and is further eroded when, in addition, that party pays the counsel fees for his phantom adversary. While we do not question the sincerity of the statement of appellants' counsel here that they were "prepared to . . . take the appellees to the mat on the case," there is nonetheless no guarantee in this or any other action that the cause will be prosecuted antagonistically and with the vigor that can be assumed when counsel is paid and directed by his own client. Who can say what subtle psychological influences might be at work — even if counsel is instructed to oppose his employer to the

fullest — when the attorney knows that his employer, having a very substantial financial interest at stake, actually desires a result opposite that which the attorney is to advocate? Since such matters may be impossible of proof in an individual case, and since the appearance of and opportunity for the frustration of justice will always be present where attorneys' fees not subject to court approval are paid by an opposing party, the payment by the appellee of fees for both his own counsel and that of his illusory antagonist must perforce be deemed collusive.

Our research reveals only one Maryland case relevant to the question of collusive suits in the context presented here. In *Fitzjarrell v. Boyd*, 123 Md. 497, 503, 91 A. 547, 548 (1914), this Court, in finding a negligence action by a guest against the owner of an automobile neither collusive nor fictitious,[1] observed that:

> If the real and primary object of the suit is to redress the grievance of the plaintiff and there is an actual controversy, involving real and substantial rights between the parties to the record, the suit [will] not be dismissed.
>
> It is only when the sole object of the suit is to affect third parties and when the interest of the parties to the suit is not adverse and when there is no real and substantial controversy between those who appear as adverse parties, that the principles [regarding collusive and fictitious suits] apply.[2]

---

1. No purpose would be served by an attempt to distinguish between fictitious and collusive suits, since most courts tend to use the terms interchangeably. A fictitious suit has been defined as "a mere colorable dispute to obtain the opinion of the court upon a question of law which a party desires to know for his own interest or his own purposes, when there is no real or substantial controversy between those who appear as adverse parties to the suits . . . ." 16A *Words and Phrases* 37 (1959). A collusive action has been defined as one "not founded upon an actual controversy between the parties to it, but brought for [the] purpose of securing a determination of a point of law for the gratification of curiosity or to settle rights of third persons not parties . . . ." 7A *Words and Phrases* 283 (1952).

2. We find nothing in Buckler v. Safe Dep. & T. Co., 115 Md. 222, 80 A. 899 (1911), where a contention was made that the proceeding was fictitious, to be contrary to the principles set forth in the above-quoted portion of the later *Fitzjarrell* case.

Those incidents establishing the collusiveness of a suit are clearly present in this case. Implicit in counsel's statements at oral argument is the fact that the arena selected its adversary; thus, the "real and primary object of the suit" is not to redress any grievance of the plaintiff. Certainly the interests of the parties cannot be truly adverse where the private-party defendant pays counsel fees for both parties. Although of course not binding upon them, it seems plain that the true object of this suit is to affect third parties: that is, by the precedential effect of a hoped-for decision by this Court upholding the validity of the act authorizing the bond sale, to discourage any future attack by others on the legality of the bonds, and by that tactic encourage their purchase by The Equitable Life Assurance Society. If this action, with the maneuvering that gave birth to it, is not collusive, it is difficult for us to envision one that is. Decisions of the Supreme Court of the United States are in accord with this conclusion. *United States v. Johnson, supra,* 319 U. S. at 304-05 (suit in which one of the parties has dominated conduct of the litigation by payment of the fees of both is collusive because in no real sense adversary, and judgment will not be allowed to stand); *Gardner v. Goodyear Dental Vulcanite Co.,* 131 U. S. ciii, ciii-civ (app.), 21 L. Ed. 141 (1873) ("it cannot be admitted that one party to a suit can pay the fees of counsel on both sides . . . without being held to have such control over both the preparation and argument of the cause, as to make the suit merely collusive"); *see Chamberlain v. Cleveland,* 66 U. S. (1 Black) 419, 17 L. Ed. 93 (1862); *Lord v. Veazie,* 49 U. S. (8 How.) 251, 12 L. Ed. 1067 (1850); *cf. Chicago & G.T.R. Co. v. Wellman,* 143 U. S. 339, 12 S. Ct. 400, 36 L. Ed. 176 (1892).

Although we have no doubt that presentation of the issues by the appellants' counsel in this case was as vigorous as could be desired, this Court ordinarily does not sit to make such assessments of counsel's conduct of a suit, and we must, for the reasons we have pointed out, conclude that selection of counsel and payment of his fees by an opposing party is always equivalent to dominating the conduct of the litigation. That is not to say, of course, that an action in

which the fees of counsel for both sides must ultimately be paid from public funds, as where the opposing parties are a municipal corporation and one of its officers, is a collusive proceeding, "since the common source of such payment does not give one party control over the preparation and argument of the cause." *City and County of San Francisco v. Boyd,* 22 Cal. 2d 685, 140 P. 2d 666, 670 (1943). But this remains true only so long as there is an actual controversy between the parties.[3] *See id.* In a case involving private parties, however, payment of counsel fees for an adversary cannot help but give the paying party control over the case, whether or not exercised in the particular instance, for "[h]e who pays the piper can call the tune." *A Collection of English Proverbs* (J. Ray ed. 1670).

We think there is no question, then, that the suit here is appropriately characterized as a collusive one, lacking on its face the "safeguard essential to the integrity of the judicial process" — adverseness between the parties. *United States v. Johnson, supra,* 319 U. S. at 305. Properly concerned as we are that questions brought before us for decision are presented with "that concrete adverseness which sharpens the presentation of issues upon which the court[s] so largely [depend] for illumination of difficult constitutional questions," *Baker v. Carr,* 369 U. S. 186, 204, 82 S. Ct. 691, 7 L.Ed.2d 663 (1962), we are at the same time acutely aware that there are occasions upon which a refusal to adjudicate issues not arising in the context heretofore deemed prerequisite to the exercise of the court's decisional responsibilities may have extremely deleterious consequences — as, for example, where a crucial city bond issue simply will not be underwritten absent a judicial determination establishing its legality. The practical necessity for an adjudication, and the absence of parties

---

**3.** A "friendly suit" is distinguished from a collusive action by the fact that a bona fide controversy exists in the former case. "The amity consists in the manner in which [the controversy] is brought to issue before the court," Lord v. Veazie, 49 U. S. (8 How.) 251, 255, 12 L. Ed. 1067 (1850); thus needless expense may be avoided by agreement not to interpose unnecessary technicalities and to admit facts known to be true without requiring proof. *Id.*

with an interest in the matter sufficient to induce them to pay the substantial costs involved in making the appropriate challenge, lead inevitably to precisely the sort of activity which occurred here—the selection of a dummy plaintiff and the payment of his counsel fees by the only truly interested party, the defendant arena — in short, a collusive suit born of the practicalities and complexities, particularly financial ones, of a democratic society in the twentieth century. Having given careful thought to the issues involved — the collusion that we should not tolerate and the necessities that we cannot ignore — this Court with this case establishes new procedures under which actions of a narrowly defined class may be adjudicated despite their collusive characteristics, and by which the competing considerations we have mentioned may be reconciled consistent with the mandates of the Maryland Constitution, the integrity of the judicial decisional process, and our prior case law. In concluding that the precise rubrics we delineate presently are an appropriate resolution of the dilemma typified by the posture of the parties to this case, we are required to consider and resolve a number of preliminary issues. The most substantial of these is whether the adversary relationship long required between the parties to a suit, which is undermined when it is collusive, is mandated by our Constitution or simply by the decisions of this Court rendered to protect the probity of the adjudicatory process. As the reader may by now surmise, we find the requirement to be a decisional one, and it is to an explication of the backdrop and rationale which produce this conclusion that we first turn.

We begin our discussion by observing preliminarily that we do not here, nor could we, decide a nonjusticiable issue. A prerequisite to the adjudication of any action under the procedures we detail below is its cognizability under the Maryland Uniform Declaratory Judgments Act, Md. Code (1974 & 1976 Cum. Supp.), §§ 3-401 to -415 of the Courts Article, and in this context we recently had occasion to observe that a court has no right to make a determination in declaratory judgment cases in which no justiciable issue is

presented. *Harford County v. Schultz,* 280 Md. 77, 86, 371 A. 2d 428, 432-33 (1977); *see Board v. Attorney General,* 246 Md. 417, 426-27, 229 A. 2d 388, 393 (1967). We have adopted, as the definition of a justiciable issue or controversy, that given in 1 W. Anderson, *Actions for Declaratory Judgments* 67 (2d ed. 1951): "A controversy is justiciable when there are interested parties asserting adverse claims upon a state of facts which must have accrued wherein a legal decision is sought or demanded." *See Harford County v. Schultz, supra* at 81 [430]; *Hamilton v. McAuliffe,* 277 Md. 336, 340, 353 A. 2d 634, 637 (1976); *Patuxent Co. v. Commissioners,* 212 Md. 543, 548, 129 A. 2d 847, 849 (1957). Since adverse claims are asserted here upon a state of facts which has accrued — plaintiffs seeking, and defendants opposing, an injunction forbidding the proposed issuance and sale of bonds and a declaration that the statute empowering the county to issue them is a special law violative of the Maryland Constitution and that their sale would not be for a public purpose — the only additional requisite for the existence of a justiciable controversy is that the parties asserting the adverse claims be "interested." We think the sole intendment of this requirement is that the plaintiff have standing to seek the declaration, since any person entitled to invoke the judicial process in a particular instance has, by virtue of that entitlement, already been defined to be an interested party.[4] Because there can be no question but that any taxpayer in Prince George's County would be entitled to seek the relief sought here, *see James v. Anderson,* 281 Md. 137, 141-42, 377 A. 2d 865, 867-68 (1977); *Citizens P. & H. Ass'n v. County*

---

4. There is no requirement that adverse parties to a suit actually disagree or desire contrary results. *See* Board v. Attorney General, 246 Md. 417, 229 A. 2d 388 (1967); City of Birmingham v. Bouldin, 280 Ala. 76, 190 So. 2d 271, 274 (1966); Golden Gate Bridge and Highway Dist. v. Felt, 214 Cal. 308, 5 P. 2d 585, 590 (1931); C. A. Wright, *Law of Federal Courts* § 12, at 40 (3d ed. 1976). It is for the court to inquire, in such a case, whether full and fair presentation is made, a duty which should be performed with care because of the stare decisis effect on other interested persons. *See* Note, *Judicial Determinations in Nonadversary Proceedings,* 72 Harv. L. Rev. 723, 734-35 (1959). That courts may adjudicate where parties desire the same result, so long as there are technical adverse interests — as in intra-governmental test cases, *e.g.,* Golden Gate Bridge and Highway Dist. v. Felt, *supra* — suggests, of course, that it may not be a constitutional impediment that inhibits the determination of collusive actions.

*Exec.*, 273 Md. 333, 339-41, 329 A. 2d 681, 684-86 (1974).—a taxpayer challenging a bond issue has the "concrete interest" required by section 3-409 of the statute, *cf. Pr. George's Co. v. Md.-Nat'l Cap.*, 269 Md. 202, 208-09, 306 A. 2d 223, 227-28, *cert. denied*, 414 U. S. 1068 (1973) — the case is a justiciable one under the Declaratory Judgments Act.[5]

Nonetheless, though the case is on its face justiciable, it is, as we have already established, collusive because, among other reasons, counsel fees were paid by an opposing party. On that account this action is, beyond all reasonable dispute, dismissible. Are we, however, because of the failure of true, as opposed to technical, adverseness between the parties, constitutionally *bound* to dismiss the suit in conformity with the principle oft-repeated in our cases that "courts will not decide moot or abstract questions, or, in the absence of constitutional mandate, render advisory opinions"? *Harford County v. Schultz, supra*, 280 Md. at 80, 371 A. 2d at 429 (quoting *Hammond v. Lancaster*, 194 Md. 462, 471-72, 71 A. 2d 474, 478 (1950)). Having concluded that this Court is not so bound, we proceed to a discussion of the case law and constitutional principles which permit the decision we announce in this case.

As noted in our earlier discussion of collusion, Maryland precedent in the area is sparse and, on the question whether a collusive case *must* be dismissed, non-existent. Nor is the federal precedent entirely illuminating on the point. Where the parties participate in such a manner that no real controversy exists, the action has been termed "an abuse which courts of justice have always reprehended, and treated as a punishable contempt of court." *Lord v. Veazie*, 49 U. S. (8 How.) 251, 255, 12 L. Ed. 1067 (1850); *see Chamberlain v. Cleveland*, 66 U. S. (1 Black) 419, 17 L. Ed. 93 (1862). And in *United States v. Johnson, supra*, 319 U. S. at

---

5. In so deciding, we do not retreat from statements in prior cases making it plain that the declaratory judgment process is not available for the decision of purely theoretical questions, questions which may never arise, questions which have become moot and abstract questions, and that it should not be used where a declaration would neither serve a useful purpose nor terminate a controversy. Hamilton v. McAuliffe, 277 Md. 336, 340, 353 A. 2d 634, 637 (1976) (citing cases). None of these categories is applicable to prohibit a decision in this case.

304, it was observed that a court may not safely proceed to judgment in the absence of a genuine adversary issue, particularly where passing on the constitutionality of legislative action; the Court, after noting that antagonism was an essential element in maintaining the integrity of the judicial process, stated:

> Whenever in the course of litigation such a defect in the proceedings is brought to the court's attention, it *may* set aside any adjudication thus procured and dismiss the cause without entering judgment on the merits. It is the court's duty to do so where . . . the public interest has been placed at hazard by the amenities of parties to a suit conducted under the domination of only one of them. [*Id.* at 305 (emphasis added).]

Professor Wright in his treatise on the federal courts suggests that application of the rule against collusive suits has not been rigid, maintaining that "some of the most famous constitutional decisions have come in what now seem to have been collusive cases." C. A. Wright, *Law of Federal Courts* § 12, at 40 (3d ed. 1976). Even were the federal courts bound, as a constitutional matter, to dismiss a collusive suit, the same result would not be mandated under the Maryland Constitution since, unlike the United States Constitution, it contains no express language limiting the judicial power to "cases" or "controversies." U.S. Const. art. III, § 2.[6]

Since we are unable to draw any direct conclusions from the case law on collusive suits, and since such actions are so akin to moot cases, in that adverse interests of the litigants are not immediately at stake in either instance, we turn to an examination of the constitutional basis *vel non* of the

---

6. "Decisions of the U. S. Supreme Court on justiciability may be peculiarly affected by the fact that the court, under Article III of the U. S. Constitution, can decide only 'cases' or 'controversies,' . . . ." Summers, *Justiciability*, 26 Mod. L.Rev. 530, 537 n. 15 (1963).

mootness doctrine.[7] If this Court were prohibited by our Constitution from rendering an opinion in a moot case, a like principle would undoubtedly apply to the adjudication of collusive suits, since the same infirmity — lack of a genuine controversy between the parties before the court at the time of the adjudication — infects both types of cases.[8] In *Lloyd v. Supervisors of Elections*, 206 Md. 36, 43, 111 A. 2d 379, 382 (1954), this Court specifically indicated that it was not deciding whether our practice of dismissing appeals moot as to the parties was due to a constitutional lack of power or was simply the application of a rule of decision, though it noted three cases in which the Court had *not* followed the principle requiring the dismissal of moot cases and had cited no authority for its actions.[9] We again left the question open

---

7. One court, which has concluded that mootness is a doctrine imposed by the court for its own protection, has examined the origins of the mootness doctrine and suggests that it is a development or refinement of the earlier feigned or collusive suit doctrine which stressed the lack of a genuine controversy and evinced a "concern for saving judicial time for real controversies and for protecting the rights of third parties whose interests might be impaired because of prior litigation." Kern v. Chicago & Eastern Illinois Railroad Co., 44 Ill. App. 2d 468, 195 N.E.2d 197, 198-99, 201 (1963), *cert. denied*, 379 U. S. 825 (1964).

8. One commentator presents a number of explanations for judicial refusal to resolve collusive and moot controversies and to render advisory opinions:

> Since adverse interests of private litigants may not be immediately at stake in these cases, or at stake only in attenuated form, the adversaries may not be sufficiently motivated to examine factual and legal issues adequately. Moreover, it may not be possible thus to examine such issues either because important consequences of alternative decisions may be unforeseeable or because the litigants may not be able satisfactorily to identify all issues and relevant considerations. Furthermore, the practice of deciding cases which have little precedent value, and which may have no significant effect on the present status of litigants, may not be a wise use of scarce judicial resources. Such a practice might also adversely affect community acceptability of judicial decisions. [Summers, *Justiciability*, 26 Mod. L. Rev. 530, 537-38 (1963) (footnotes omitted).]

9. Munsell v. Hennegan, 182 Md. 15, 31 A. 2d 640 (1943); Sheehy v. Thomas, 155 Md. 688, 142 A. 506 (1928); Close v. Southern Md. Agr. Asso., 134 Md. 629, 108 A. 209 (1919). See Bd. of Ed. v. Montgomery County, 237 Md. 191, 195, 205 A. 2d 202, 204-05 (1964) ("we have decided important recurring questions which otherwise would not have been heard on appeal . . . on the ground that otherwise the determination of the recurring question might be indefinitely delayed").

The *Lloyd* Court also noted:

> In cases where the matter is of public importance, this Court,

in *Bd. of Public Welfare v. Myers*, 224 Md. 246, 251, 167 A. 2d 765, 768 (1961). As Judge Hammond pointed out for the Court in *Lloyd*, while dismissal of moot cases has been grounded at times on constitutional limitations of power, "[u]sually . . . courts accept as a rule of decision governing the exercise of jurisdiction, that a case which is moot will not be decided." 206 Md. at 42, 111 A. 2d at 381. The *Lloyd* opinion further indicated that this Court has apparently treated the question, for the most part, as a rule of decision. *Id.* Today we definitively close the door left ajar in *Lloyd* and *Myers* and hold, in accord with our actual past practice, that we are inhibited from rendering a decision in a moot case only by our own adherence to the "settled rule which governs the deliberation and adjudications of courts generally, namely, that they do not sit to decide abstract questions of law," *Lloyd v. Supervisors of Elections, supra* at 42 [381], and not by any constitutional prohibition. In so deciding, we bring the unstated theory supporting a number of our past decisions, *see* note 9 *supra*, into congruence with our actual practice in deciding such cases, without trenching on the constitutionally-imposed limitations on our jurisdiction, to which we shall shortly advert.

This Court in *Lloyd*, while recognizing that we have never addressed the question directly, noted authorities apparently contrary to the proposition that we have always treated the dismissal of moot cases as a decisional rather than a constitutional question. The principal case suggesting

---

from time to time, has dismissed an appeal where there was no right of appeal or where the appeal was premature, and yet has stated its views on the question presented. *Board of Medical Examiners v. Steward*, 203 Md. 574, 102 A. 2d 248 [(1954)]; *State v. Haas*, [188 Md. 63, 51 A. 2d 647 (1947)]. . . . In such instances, the controversy between the parties still lives, and the views of the Court on the questions raised are immediately pertinent and not merely general or advisory, in that they will control the future course of the controversy. [206 Md. at 41-42, 111 A. 2d at 381.]

*See* Lee v. State, 161 Md. 430, 434, 157 A. 723, 724 (1931) (dismissing proceeding but expressing an opinion on question sought to be reviewed "because, if the court entertains now views which might later cause a reversal of a conviction of this prisoner and necessitate a second trial, it seems desirable that those views should be expressed while the case is before the court"). See also State v. Harman, 199 Md. 209, 214, 86 A. 2d 397, 399 (1952); Binswanger v. Whittle, 176 Md. 146, 148, 2 A. 2d 174, 175 (1938).

otherwise, the language of which has been frequently quoted in subsequent opinions, is *Hammond v. Lancaster*, 194 Md. 462, 471-72, 71 A. 2d 474, 478 (1950), where, as has already been indicated, we observed that courts will not decide moot or abstract questions, "or, in the absence of constitutional mandate, render advisory opinions." Initially, we observe that the rendition of an advisory opinion is often said to be the result of deciding a case which is moot as to the parties before the court. Thus, in *Price v. Cohen*, 206 Md. 45, 48, 109 A. 2d 920, 921 (1954), decided on the same day as *Lloyd*, we explained that in *Lloyd*, where the case was moot when it reached this Court, we had held

> that the Court should not give a decision on the matter presented, even assuming that the Court possessed the power to do so, because the question was not of such general public interest nor so likely to reoccur with such frequency as to call for an advisory opinion.

*See Tanner v. McKeldin*, 202 Md. 569, 580-81, 97 A. 2d 449, 454 (1953) (suit for declaratory relief which did not allege actual justiciable controversy in effect prayed for advisory opinions which the court properly refused); *cf.* 1 C.J.S. *Actions* § 19, at 1059 (1936) (action is fictitious or collusive, and cannot be maintained, where its real object is to procure an advisory opinion of the court without an actual contest) (citing cases). Thus where the term "advisory opinion" is used in that sense — an opinion rendered in a judicial proceeding, but which cannot be actually effectuated as to the parties before the court (as where the case is moot, or where the court expresses its views despite its dismissal of the appeal on jurisdictional grounds) [10] — the same principle must apply as applies to the decision in a moot case, that is, the rendition of an opinion is not *constitutionally* prohibited.

We think that, when our predecessors in *Hammond* indicated that the Court would not, *absent constitutional*

---

**10.** *E.g.*, Kardy v. Shook, J., 237 Md. 524, 534, 207 A. 2d 83, 88-89 (1965) (interlocutory order not appealable, but views expressed on issue of great public concern). Such instances are exceedingly rare.

*mandate,* render an advisory opinion,[11] they referred to "advisory opinion" in an entirely different and very specific sense — "an answer given by the justices of a state's highest court acting in their individual capacities, at the request of a coordinate branch of government, to a legal question regarding a matter pending before the requesting authority." Comment, *The State Advisory Opinion in Perspective,* 44 Fordham L. Rev. 81, 81 (1975).[12] There is no doubt whatever that this Court is constitutionally prohibited from rendering an advisory opinion of this nature — the legislature could not require or authorize it by statute nor could this Court determine to render such an opinion were one simply requested of us by either the legislature or the executive.[13] Our inability to render such an opinion flows from two constitutional limitations on our jurisdiction. One of these is that our jurisdiction is solely appellate. Section 14 of Article IV of the Maryland Constitution provides that the "jurisdiction of the Court of Appeals shall be co-extensive with the limits of the State and such as now is or may

---

11. It should be noted that the words "in the absence of constitutional mandate" modify *only* the clause respecting advisory opinions, and not the clause concerning moot or abstract questions.

12.    As the term is used in the United States today, an advisory opinion is a formal opinion by a judge or judges of a supreme court, or by a supreme court, in answer to a question of law, submitted by a legislative body or a governor, a council, or a governor and council, of a state, which question is not related to nor concerned with a case or controversy in actual litigation at the time, and which does not involve private rights. [Stevens, *Advisory Opinions — Present Status and an Evaluation,* 34 Wash. L. Rev. 1, 1-3 (1959) (footnotes omitted).]

In states using the advisory opinion procedure, there is authority to the effect that such opinions "are advisory only, result in no judgment or decree, and bind no one." *Id.* at 6 (citing cases).

13. We have said that this Court will not render advisory opinions "to the Legislature or to anyone else." Planning Commission v. Randall, 209 Md. 18, 27, 120 A. 2d 195, 199 (1956). *Randall* involved a suit brought as a "special case stated" (now governed by Maryland Rule 329) by an administrative agency of the State against the Secretary of State in which the agency contended that a bill, if passed over the governor's veto, would be void. Our predecessors concluded that, since the bill had not yet been enacted, any relief granted would constitute "plain interference with legislative action" forbidden by the separation of powers provision of the Declaration of Rights, and that the appellant was asking for an advisory opinion on pending legislation. *Id.* at 26-27 [199].

hereafter be prescribed by law." And we have long held that, since the Court had, under former Constitutions, appellate jurisdiction only, our jurisdiction under the present Constitution remains so confined, *Shell Oil Co. v. Supervisor*, 276 Md. 36, 40, 343 A. 2d 521, 524 (1975); *Sevinskey v. Wagus*, 76 Md. 335, 336, 25 A. 468, 468-69 (1892); hence the legislature cannot confer original jurisdiction upon this Court. *Shell Oil Co. v. Supervisor*, *supra* at 41 [524]; *Board v. Attorney General*, 246 Md. 417, 427, 229 A. 2d 388, 393 (1967); *Sevinskey v. Wagus*, *supra.* That being so, clearly we cannot be required to give an advisory opinion at the request of the legislature or executive, since "the exercise of appellate jurisdiction requires a prior action by some *judicial* authority, or the prior exercise of *judicial* power. . . ." *Shell Oil Co. v. Supervisor*, *supra* at 43 [525]; neither, of course, can we undertake to do so of our own accord.

The other constitutional limitation which prohibits this Court, or indeed any Maryland court, from rendering such an opinion to the legislature or executive flows from Article 8 of our Declaration of Rights, which mandates that the powers of the three departments of government be "forever separate and distinct." We have many times stated that Article 8 prohibits the courts from performing nonjudicial functions. *E.g., Shell Oil Co. v. Supervisor*, *supra* at 46 [527]; *Cromwell v. Jackson*, 188 Md. 8, 13, 52 A. 2d 79, 82 (1947). Moreover, we have said that "all judicial authority is only such as is provided for by Article 4 of the Maryland Constitution, and it has been decided that only judicial functions can be exercised which find their authority in that Article. . . ." *Dep't of Nat. Res. v. Linchester*, 274 Md. 211, 223, 334 A. 2d 514, 522 (1975) (quoting *Dal Maso v. County Commrs.*, 182 Md. 200, 205, 34 A. 2d 464, 466 (1943)). We find nothing in Article IV which could be construed to authorize the rendering of this type of advisory opinion, and we think there can be no doubt that the giving of such an opinion is in fact a nonjudicial function. Our predecessors long ago pointed out that "[i]t is of the very essence of a judicial function . . . that it shall be a proceeding between parties."

*Robey v. Prince George's County*, 92 Md. 150, 162, 48 A. 48, 50 (1900). For other authority to the effect that the giving of such opinions is not the exercise of a judicial function, see *Opinion of the Justices of Supreme Court*, 314 A. 2d 419, 420 (Del. 1973); *In re Opinion of the Justices*, 115 Vt. 524, 64 A. 2d 169, 171, 172 (1949); *In re Elliott*, 74 Wash. 2d 600, 446 P. 2d 347, 355 (1968) (en banc); Stevens, *Advisory Opinions — Present Status and an Evaluation*, 34 Wash. L. Rev. 1, 9 (1959) (citing cases); Comment, *The State Advisory Opinion in Perspective*, 44 Fordham L. Rev. 81, 82 (1975) (citing cases); Comment, *The Advisory Opinion and the United States Supreme Court*, 5 Fordham L. Rev. 94, 103 (1936). If more support for this proposition were desired, one need only consider some of the generally recognized indicia of judicial power, which include: the power to make a final rather than an initial determination, the power to make binding judgments, the power to affect the personal or property rights of private persons, the exercise of power formerly held by a court, and the fashioning of remedies which are judicial in nature. *See County Council v. Investors Funding*, 270 Md. 403, 436, 312 A. 2d 225, 243 (1973). None of these inhere in the rendition of such an advisory opinion.

We think that the constitutional limitations we have just described are those to which the Court in *Hammond* referred when it indicated that advisory opinions would not be rendered without constitutional mandate.[14] It is apparent to us that those limitations are not applicable to prevent our decision in a moot case where the requisite extraordinary circumstances exist.[15] The decision of any such case would obviously not contravene the requirement that we exercise only appellate jurisdiction; neither do we believe that it can

---

14. The *Hammond* Court actually determined in the suit before it that, as to some of the issues presented, the plaintiffs lacked standing and there was thus no justiciable case presented. 194 Md. at 477-79, 71 A. 2d at 481. The cited language was contained in its preliminary discussion of the standing question, in which it enunciated "a number of subordinate rules that tend to limit the scope of review" after indicating that the doctrine of judicial review "may be considered as a correlative to the doctrine of the separation of powers. . . ." *Id.* at 471 [478].

15. Maryland Rules 835 a 6 and 1035 b 8 authorize but do not compel dismissal of a case on appeal that has become moot.

fairly be said that such a decision is outside the judicial role. Certainly it is a function that could not be performed by another branch of government. *See Solvuca v. Ryan & Reilly Co.*, 131 Md. 265, 282, 101 A. 710, 715 (1917), *cited in Shell Oil Co. v. Supervisor, supra,* 276 Md. at 45-46, 343 A. 2d at 526 (to make a function judicial it must be "the exercise of discretion and judgment within the subdivision of the sovereign power which belongs to the judiciary, or, at least, which does not belong to the legislative or executive department"). We are loath to conclude that, simply because a judgment of this Court can no longer affect the rights of the parties who have brought the dispute before us for adjudication, it is necessarily beyond the judicial function without regard to the public importance of the issues, the likelihood of recurrence, and other similar factors. Particularly where a controversy is live when appealed to this Court and the opposing positions are vigorously presented, so that the action is clearly suitable for resolution through the judicial process, in the absence of a clear constitutional prohibition, either express or reasonably implied, we decline to infer that it may never be judicially resolved. We emphasize, however, that we will exercise this authority only in rare instances which demonstrate the most compelling of circumstances.

Only one other case was cited by the *Lloyd* Court to support the possibility that the decision of a moot case might be impermissible for constitutional reasons, and we will dispose of it with a brief discussion. In *State v. Shields,* 49 Md. 301 (1878), the Court dismissed an appeal by the State after acquittal of the defendant in a criminal case; review was requested of exceptions taken by the State to various rulings of the trial court admitting testimony offered by the accused. Since the verdict would have to stand whether the court's rulings were correct or not, this Court dismissed the appeal, concluding that the verdict *discharged* the defendant; he was thus no party to the appeal and there was no cause before the court. *Id.* at 305. We agree with our predecessors' conclusion that adjudication in this case was beyond their constitutional power. Decision in such a

situation would be virtually indistinguishable (other than for the manner of making the request) from the rendition of an advisory opinion in the classic sense — an opinion in answer to a question of law from the executive branch (the State's Attorney) *"which question is not related to nor concerned with a case or controversy in actual litigation at the time,* and which does not involve private rights." Stevens, *Advisory Opinions — Present Status and an Evaluation,* 34 Wash. L. Rev. 1, 2-3 (1959) (emphasis added, footnotes omitted). To have delivered an opinion in *Shields* would in truth have been the exercise of a nonjudicial function, since the essence of that function, as we have pointed out, is that there be a proceeding between parties, *Robey v. Prince George's County,* 92 Md. 150, 162, 48 A. 48, 50 (1900), and there was only one party before this Court in *Shields.*[16]

Finding nothing in either *Hammond* or *Shields* to be to the contrary, we conclude there is no constitutional bar to our rendering an "advisory opinion" as that term is loosely used [17] to refer to the decision of a case in which, because the

---

**16.** *Shields* has been cited for the proposition that the legislature cannot confer original jurisdiction on the Court of Appeals, *see* Shell Oil Co. v. Supervisor, 276 Md. 36, 41-42, 343 A. 2d 521, 524 (1975); Sevinskey v. Wagus, 76 Md. 335, 336, 25 A. 468, 469 (1892); this reading of *Shields* supports our interpretation of the case, since the giving of an advisory opinion in the classic sense — which is essentially what would have occurred had the Court delivered an opinion — is an exercise of original jurisdiction.

*Shields* has also been cited for the principle that the legislature may not require the Court to decide a moot question or an abstract proposition. *See* Board v. Attorney General, 246 Md. 417, 427, 229 A. 2d 388, 393 (1967). This principle, however, states nothing in respect of any constitutional limitation on the Court, but indicates only that the separation of powers provision of the Declaration of Rights would not permit such an interference by the legislature with the judicial function, it being plainly within the province of the Court to determine the circumstances under which it might properly entertain such an action.

**17.** The distinction we perceive between the two uses of the term "advisory opinion" has been recognized before:

It is necessary . . . to distinguish the general features of that vilified procedure [the advisory opinion] from the conditioning elements of related types of proceedings. The advisory opinion is an anticipatory opinion, given in advance of actual litigation, at the behest of another organ of the government, relating to the validity of action contemplated or already taken by such authority. . . . As a consequence of the unqualified disapproval by the [Supreme] Court [of the United States] of

action is either moot or collusive, there is no actual controversy between the parties before the court. *See Price v. Cohen,* 206 Md. 45, 48, 109 A. 2d 920, 921 (1954) (suggesting that where case is moot, decision on matter presented would be an advisory opinion); *Golden Gate Bridge and Highway Dist. v. Felt,* 214 Cal. 308, 5 P. 2d 585, 589 (1931) (referring to a collusive proceeding as an attempt to secure an advisory opinion); 1 C.J.S. *Actions* § 19, at 1059 (1936) (action is collusive where real object is to procure an advisory opinion without an actual contest). Just as this Court has heretofore occasionally found it prudent to render decisions in cases moot as to the parties where the appropriate circumstances appear, *see* cases cited in note 9 *supra,* so too, as we have indicated earlier, there are circumstances in which the refusal to adjudicate a collusive suit may have untoward consequences, particularly where governmental action is involved. We are cognizant as well, however, that it is essential to the effective functioning of the adjudicatory process that judgments, particularly those involving constitutional issues, be rendered only after the court has had the benefit of full presentation of opposing positions on the questions upon which it is to express an opinion.

Recognizing these various considerations — our power to adjudicate cases even though collusive, the practical necessity for judicial decision in a narrow class of those cases, and the need for safeguards to rectify the lack of adverseness which inheres in such suits — and having given the matter substantial thought, we have determined to reconcile the conflicting considerations as follows: A declaratory judgment suit having as a proper party a governmental body, or an agency or official thereof, and

any appeal suggesting the exercise of such a function, the term has developed a wider and different import. It has been used indiscriminately to describe nearly every type of proceeding denominated by the Court as non-justiciable and not within the limits of its jurisdiction as circumscribed by the Constitution. [Comment, *The Advisory Opinion and the United States Supreme Court,* 5 Fordham L. Rev. 94, 95-96 (1936) (footnotes omitted).]

*See* Weinstein, *Rendering Advisory Opinions — Do We, Should We?,* 54 Judicature 140, 143 (1970).

otherwise cognizable under sections 3-401 to -415 of the Courts Article, which action involves the validity of a statute or governmental regulation having the force of statute, or an urgently needed determination affecting future governmental conduct, and in which the public's concern is both imperative and manifest,[18] need not hereafter necessarily be dismissed as collusive by a court of this State if there is strict adherence to the following procedures: (1) that the court is informed by the party actually initiating, promoting or financing the litigation, at the time of filing of that party's initial pleading, that the opposing party, though having standing to maintain the suit, nonetheless appears in a manner which may render the action collusive; (2) that the party actually desiring the requested adjudication bind itself, in such manner as may be prescribed by the court, to pay at the court's direction such fees and other expenses of counsel appointed in the manner provided next below; and (3) that the court name counsel, without recommendation or suggestion by any party to the action, to present in the same manner and to the same extent as though representing a truly adverse party, a position in opposition to that taken by the party who initiated and for whose benefit the action was instituted. We think these procedures, while allowing adjudication in a narrow class of collusive actions where the necessity for it plainly appears, will nevertheless guarantee that the issues to be decided are precisely framed, focused, and thor-

---

**18.** In this regard it may be helpful to recall the language of the Court in Lloyd v. Supervisors of Elections, 206 Md. 36, 43, 111 A. 2d 379, 382 (1954), where we noted circumstances under which the decision of issues moot as to the parties might be appropriate:

[T]he better considered and reasoned cases take the view that only where the urgency of establishing a rule of future conduct in matters of important public concern is imperative and manifest, will there be justified a departure from the general rule and practice of not deciding academic questions. They hold that if the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then the Court may find justification for deciding the issues raised by a question which has become moot, particularly if all these factors concur with sufficient weight.

oughly explored, *see United States v. Fruehauf*, 365 U. S. 146, 157, 81 S. Ct. 547, 5 L.Ed.2d 476 (1961), in accordance with the principles which underlie our adversary system of justice. *See Whelan v. N.J. Power & Light Co.*, 45 N. J. 237, 212 A. 2d 136, 138-39 (1965). (Court appoints amicus to insure that validity of bond issue is "earnestly explored".)

Having delineated the circumstances under which the adjudication of collusive suits arising hereafter may be appropriate, we now proceed to the disposition of the present appeal. Since it is an action seeking a declaratory judgment, involves the validity of a bond issue enabling statute, has as a proper party a governmental body, and is of sufficient public concern, the suit is of the class of cases which may, in the court's discretion, be adjudicated under the procedure we have just outlined. Obviously, however, appellee Washington National Arena could not have complied with these procedures, and it did not reveal to the court the true nature of the case, as it should have done. Nonetheless, no effort was made to affirmatively conceal the true facts, and the safeguards against insufficient adverseness we have just enunciated for future such cases have in this case been effectuated through this Court's own actions: Having undertaken an independent check, far more extensive than we would otherwise deem necessary, upon the research and presentation made by the appellants' counsel, we are satisfied that their function was adequately performed and that our responsibilities will not be compromised by proceeding to the merits.

## II. The Merits

The appellants, Pedro J. and Janeanne F. Reyes, residents of and taxpayers in Prince George's County, here challenge, as they did in their petition for declaratory and injunctive relief filed in the circuit court for that county, the validity of a portion of Chapter 396 of the Laws of 1973. Md. Code (1957, 1971 Repl. Vol., 1976 Cum. Supp.), Art. 41, § 266A (a), *repealing and reenacting* Md. Code (1957, 1971 Repl. Vol., 1972 Cum. Supp.), Art. 41, § 266A (a).

Historically, this case had its genesis in Chapter 290 of the

Laws of 1963, now codified, as amended, as Code (1957, 1971 Repl. Vol., 1976 Cum. Supp.), Art. 41, §§ 266A-266-I, "Industrial Buildings for Counties and Municipalities." As originally enacted, this act permitted the issuance of revenue bonds by county and municipal governments for the acquisition of industrial buildings to be leased to private tenants. The act was identified in *Md. Indus. Devel. v. Meadow-Croft*, 243 Md. 515, 517, 221 A. 2d 632, 634 (1966), as "one of three statutory stimuli to industrial development," the others being found in Code (1957, 1971 Repl. Vol. & 1976 Cum. Supp.), Art. 41, §§ 266J-266CC, which created the Maryland Industrial Development Financing Authority, and in Code (1957, 1973 Repl. Vol. & 1976 Cum. Supp.), Art. 23, §§ 412-429, which created the Development Credit Corporation. *See Md. Indus. Devel. v. Helfrich*, 250 Md. 602, 607, 243 A. 2d 869, 871 (1968). In this regard we note that there exists a special exemption from federal income tax for interest paid on industrial development bonds issued to finance sports facilities. *See* I.R.C. § 103 (b) (4) (B).

The factual background of this case is derived in part from an agreed statement of facts entered into by the parties. In early 1972 Abe Pollin, who had an opportunity to purchase a hockey franchise from the National Hockey League, approached both the county and the District of Columbia in regard to the financing and construction of a sports facility. In May 1972 the chairman of the county council and the county executive wrote to Pollin, urging him to locate the proposed arena in the county, and agreeing to explore the possibility of financing construction by the issuance of long-term county obligations. In mid-June Pollin was awarded a conditional franchise. In 1971 a site at Largo in the county had been leased by Maryland-National Capital Park and Planning Commission to Potomac Sports, Ltd.; in August 1972 the lease was assigned to Washington National Arena Limited Partnership, formed by Pollin.[19]

---

**19.** The lease is for an initial term of 20 years accounting from September 1, 1972. At the expiration of the initial term, the lessor has the option of renewing the lease for 10 years or acquiring the improvements. At the end of the first renewal term, the lessor has the option of renewing the

Construction commenced in August 1972, and the arena was completed by December 1973. Financing was provided by two commercial loans negotiated by the partnership: one for $12,000,000.00, and a second for $6,000,000.00, requiring only the payment of interest until September 1, 1977. An additional $2,000,000.00 of county funds were expended to provide sewer facilities and access roads at the site of the arena. This authorization was made by the county in Bill No. CB-160-72 as an emergency measure, which this Court upheld in *Biggs v. Md.-Nat'l Cap. P. & P. Comm'n*, 269 Md. 352, 306 A. 2d 220 (1973).

In 1973 section 266A (a) of the act, which theretofore empowered municipalities and counties to finance the acquisition of industrial buildings or port facilities to be leased to others by sale of revenue bonds, was amended by the General Assembly by the enactment of Chapter 396 of the Laws of 1973, so as to include in the definition of industrial buildings "any sports stadium or sports arena in Prince George's County." In October 1973 the county council by the enactment of Bill No. CB-165-73 authorized the issuance and sale of revenue bonds in an aggregate principal amount not to exceed $23,000,000.00, having a maturity of not more than 25 years, to provide long-term financing for the cost of constructing the arena. In pursuance of the provisions of the ordinance the county proposes to issue $20,000,000.00 of revenue bonds, which as a result of negotiations will be sold to The Equitable Life Assurance Society of the United States, and to lend the proceeds of the sale to the partnership. The loan is to be evidenced by the note of the partnership in an amount equivalent to the borrowing, and is to be additionally secured by a first mortgage or deed of trust on the partnership's leasehold interest in the arena. Both the note and the mortgage or deed of trust will be assigned by the county to a trustee or trustees to be held for the benefit of the holder of the bonds.

In their suit filed in May 1977, Mr. and Mrs. Reyes named as defendants the county, the county executive, the

---

lease for a second renewal term of 10 years or of acquiring the improvements.

members of the county council, and the partnership. The petition sought a declaration that (1) the 1973 amendment to section 266A (a) of the act was a special law, violative of Article III, section 33 of the Maryland Constitution and (2) the sale of the bonds and the loan of the proceeds to the partnership would not be for a public purpose; it also sought an injunction forbidding the issuance and sale of the bonds. Alternatively, the petition sought an injunction forbidding the partnership from granting and the county from accepting a mortgage or deed of trust securing the partnership's note. From a decree declaring that Chapter 396 of the Laws of 1973 is valid, that the sale of the bonds and the loan of the proceeds is for a public purpose, and that the county is not precluded from becoming a secured party by the council's ordinance, Mr. and Mrs. Reyes appealed to the Court of Special Appeals.[20] We granted certiorari prior to that court's consideration of the case.

We turn now to an analysis of the appellants' contentions, the first of which is that Chapter 396 of the Laws of 1973 is a special law in contravention of Article III, section 33 of the Maryland Constitution. That provision reads, in part:

> The General Assembly shall not pass local, or special Laws, in any of the following enumerated cases, viz.: For extending the time for the collection of taxes; granting divorces; changing the name of any person; providing for the sale of real estate, belonging to minors, or other persons laboring under legal disabilities, by executors, administrators, guardians or trustees; giving effect to informal, or invalid deeds or wills; refunding money paid into the State Treasury, or releasing persons from their debts, or obligations to the State, unless recommended by the Governor, or officers of the Treasury Department. And the General Assembly shall pass no special Law, for

---

20. No appeal was taken from an order sustaining the demurrer of the individual defendants.

any case, for which provision has been made, by an existing General Law.

The principal thrust of the appellants' argument is that Chapter 396 is a special law because, at the time of its enactment, the arena was the only "sports stadium or sports arena in Prince George's County," in the language of the amendment. Had the amendment identified the arena by name, this point might have been well taken. Such was the case in *Baltimore City v. Starr Church*, 106 Md. 281, 67 A. 261 (1907), in which our predecessors struck down as a special law a statute which identified a particular income-producing property as being owned by the church, and then purported to exempt it from taxation. A similar result was reached in *Beauchamp v. Somerset County*, 256 Md. 541, 261 A. 2d 461 (1970), where the statute purported to exempt from Sanitary District charges any property owned by an incorporated American Legion Post located in the District. Since the enactment designated a particular war veterans' group to be the only beneficiary of the tax exemption, we held the statute to be a special law.

These cases are consistent with the prior holdings of this Court that a special law is a law for a special case, *Norris v. Baltimore*, 172 Md. 667, 682, 192 A. 531, 538 (1937), and that a special law is one for the relief of named parties or provides for individual cases. *Montague v. State*, 54 Md. 481, 489-90 (1880). *But see Williams v. Mayor*, 289 U. S. 36, 45-47, 53 S. Ct. 431, 77 L. Ed. 1015 (1933) (distinguishing *Starr Church* and reaching a contrary result). *Starr Church* and *Beauchamp* should be contrasted with *Potomac Sand & Gravel v. Governor*, 266 Md. 358, 293 A. 2d 241, *cert. denied*, 409 U. S. 1040 (1972), where we upheld an act of the General Assembly making it a criminal offense to dredge for sand, gravel or aggregate in the tidal waters or marshlands of Charles County, even though Potomac Sand & Gravel was, at the time, the only party engaged in such dredging in Charles County.

In short, had Chapter 396 specifically identified the arena by name or in any equivalent manner, it might well have

been a special law, but when it referred to sports arenas or sports stadia no matter where located in the county, any facility meeting this definition fell within its ambit. We paraphrase the language of *Potomac Sand & Gravel v. Governor, supra,* 266 Md. at 379, 293 A. 2d at 252:

> Chapter 396 resembles a public law more than a special law. It does not provide for the relief of a particular named party. It is true that the arena may be the only party affected by Chapter 396, but if the county wishes to acquire or finance other sports facilities in the county, it may do so. Chapter 396 is applicable to all such facilities but it is limited to Prince George's County.

The appellants next contend that the proposed mortgage on the partnership's interest in the arena will cause the county to acquire an interest in the arena in contravention of the county council's Bill No. CB 165-73. While it is true that section 1 (8) of that ordinance provides that the "County will acquire no interest in the Sports Arena, either on its own behalf or for the purposes of creating any security for the Bonds. . . ," the ordinance clearly contemplated that the county would follow the alternative procedure provided for by section 266H-1 of the act: Instead of acquiring the facility with the bond proceeds the county would lend the proceeds to the partnership to finance the acquisition of the arena, taking in return the note of the partnership evidencing the loan, and accepting as permitted by section 266H-1, as additional security for the repayment of the note, a mortgage or deed of trust on the partnership's leasehold interest in the arena, which would immediately be assigned to a trustee for the bondholders as security for the payment of the bonds. The trial court found, and we agree, that this was a security interest only, and not an interest in the arena as such.

The appellants also argue that the purpose for which the industrial revenue bonds are to be issued — to retire noninterim financial obligations incurred by the partnership for the acquisition of the arena — is not a valid public

purpose. Here, we turn to the teachings of *Frostburg v. Jenkins*, 215 Md. 9, 136 A. 2d 852 (1957), where an attack was levied against the construction of a lingerie factory by Frostburg with public funds. There, our predecessors said, "What is a public purpose for which public funds may be expended is not a matter of exact definition; it is almost entirely a matter of general acceptation," *id.* at 16 [855], and again, "So long as the legislation has a substantial relation to the public welfare and can fairly be said to serve a public purpose, it is not the courts' function to strike it down . . . ." *Id.* at 19 [857]. "[T]he line of demarcation is not immutable or incapable of adjustment to changing social and economic conditions that are properly of public and governmental concern." *Id.* at 16 [855]; see also *Pr. George's Co. v. Collington*, 275 Md. 171, 190, 339 A. 2d 278, 288 (1975); *Williamsport v. Sanitary District*, 247 Md. 326, 331-32, 231 A. 2d 40, 43-44 (1967); *Lerch v. Md. Port Authority*, 240 Md. 438, 214 A. 2d 761 (1965); *Finan v. M. & C.C. of Cumberland*, 154 Md. 563, 141 A. 269 (1928); 56 Am.Jur.2d *Municipal Corporations, Counties, and Other Political Subdivisions* § 533 (1971).

The parties have stipulated that since its completion in December 1973 the arena has made the following payments to state and local governments:

| | |
|---|---|
| Rent, Maryland-National Capital Park and Planning Commission | $ 426,063.00 |
| Rent to Commission, in lieu of taxes | 1,137,500.00 |
| Admission taxes | 4,578,358.00 |
| Maryland State athletic commission tax | 258,352.00 |
| Sales tax | 456,603.00 |
| | $6,856,876.00 |

Additionally, the arena employs 400 people, with an annual payroll of $2,000,000.00. *See* Annot., 67 A.L.R.3d 1186, 1193-96 (1975) (collecting cases holding that the acquisition of multi-purpose stadia constitutes a public purpose). It was

stipulated that the arena is utilized not only for professional basketball and hockey games and other athletic events, but also for concerts and other events of cultural and public interest. The appellants also seem to argue that while public purpose might have supported an original financing, it cannot be availed of to support a refinancing. A similar argument was rejected in *Wilson v. Board of Co. Comm'rs,* 273 Md. 30, 327 A. 2d 488 (1974), where we upheld the financing of pollution control equipment through the issuance of industrial revenue bonds after such equipment had been designed, contracted for and partially completed.

Having determined that the declaration entered by the Circuit Court for Prince George's County was proper, we will affirm its decree.

> *Decree affirmed; costs to be paid*
> *by appellants.*
> *Mandate to issue forthwith.*

*Murphy, C. J., and Eldridge, J., concurring in the judgment:*

We concur in the judgment affirming the decree, but not in the holding of the majority that the case is dismissible as being collusive.