# THE COLUMBIA PARK AND RECREATION ASSOCIATION, INC. *v.* CHRISTOPHER OLANDER ET AL.

[No. 87, September Term, 1979.]

*Decided January 30, 1980.*

*Motions for reconsideration filed February 15, 1980 and motion to intervene filed February 19, 1980; motions for reconsideration and to intervene denied February 22, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*Roger D. Redden,* with whom were *W. Gar Richlin* and *David M. Funk* on the brief, for appellant.

*Lawrence S. Greenwald,* with whom were *Barry F. Rosen* and *Michael R. Braudes* on the brief, for appellees.

MURPHY, C. J., delivered the opinion of the Court. ELDRIDGE, J., dissents and filed a dissenting opinion at page 10 *infra.*

The Circuit Court for Howard County (Macgill, J.), by decree dated August 20, 1979, declared that § 2 of chapter 175 of the Acts of 1978 and § 2 of chapter 314 of the Acts of 1979 were unconstitutional and invalid as being in contravention of the contract clause of Article I, § 10 of the Constitution of the United States.[1] We granted certiorari upon petitions filed by both the appellant and the appellees prior to decision by the Court of Special Appeals to review the important issues raised on the appeal. After careful review of the case, however, we must vacate the decree of the lower court and order the action dismissed on the ground that the suit is a collusive one within the principles recently articulated in *Reyes v. Prince George's County,* 281 Md. 279, 380 A.2d 12 (1977). A full understanding of the reasons underlying our action necessitates a detailed recitation of the background facts out of which the case arose.

The appellant Columbia Park and Recreation Association, Inc. (CPRA), a nonprofit membership corporation, was incorporated in Maryland on December 10, 1965 "for the promotion of the common good and social welfare of the people of the community of Columbia and its environs." Columbia is not a municipal corporation but a planned community in Howard County, Maryland, covering approximately 15,000 acres and having a population of some 50,000 persons. CPRA is responsible for developing community and recreational facilities, operating and providing community programs and services, and

---

1. Section 10 provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

maintaining and developing the parkland and open space in Columbia.

The services and facilities provided by CPRA include a public transportation system which runs throughout Columbia, connecting the various neighborhoods and downtown Columbia. The system also provides service between Columbia and Ellicott City and the area adjoining Ellicott City. CPRA is currently receiving funds from the Maryland Department of Transportation to assist in the payment of the operating expenses of the system.

To date, CPRA has developed and maintains in Columbia over 40 miles of pedestrian and bicycle pathways and over 1,000 acres of parks and open space.

As of April 30, 1978, CPRA had invested over $16,700,000 in recreation and community facilities. Among these facilities are 12 neighborhood centers, 13 neighborhood pools, 4 village community centers, an indoor swim complex, an indoor skating rink, 2 tennis clubs, 12 public tennis courts, a horse center, an athletic club, 2 golf courses, 3 day-care centers, a children's zoo and a visual arts center.

In order to provide CPRA with a secure revenue source for meeting its community responsibilities, The Howard Research and Development Corporation (HRD), the developer of Columbia, caused all property in the new town to be subject to an annual charge. This was accomplished by HRD's conveying its Columbia property to CPRA, which, in turn, conveyed the property to C. Aileen Ames, pursuant to a Deed, Agreement and Declaration of Covenants, Easements, Charges and Liens, dated December 13, 1966 (the Declaration). The property was then reconveyed to HRD, subject to the covenants, easements, charges and liens imposed by the Declaration. Among other things, the Declaration provides for a charge (the Annual Charge) to be levied in each year against property subject to the Declaration in an amount not to exceed $.75 per $100 of Assessed Valuation, a term defined in the Declaration as the

> "highest valuation placed on land and permanent improvements in each year for Howard County or Maryland State real estate tax purposes, whichever

> may be higher, as assessed or determined in such manner as may from time to time be provided by applicable law, regardless of any decrease of such valuation during such year by reason of protest, appeal or otherwise . . . ."

Appellees Christopher and Alice Olander, as owners of property subject to the Declaration, are obligated under the terms of the Declaration to pay the Annual Charge assessed by CPRA against their property.

CPRA's services and facilities are financed, in part, through CPRA's Senior Secured Bonds, which are issued pursuant to a Trust Agreement dated as of January 30, 1973, by and between CPRA and Columbia Bank and Trust Company (the Trustee), as supplemented and amended from time to time (the Trust Agreement). To secure CPRA's Senior Secured Bonds, CPRA has conveyed to the Trustee the proceeds from, and the enforcement rights relating to, the collection of the Annual Charge. The Trust Agreement requires CPRA to collect from the proceeds of the Annual Charge in each year an amount equal to the maximum annual debt service on its outstanding bonds. CPRA is prohibited from issuing any additional bonds unless the Assessed Valuation of property subject to the Declaration will produce annual revenues at least equal to 110% of the maximum annual debt service on its outstanding bonds and the additional bonds to be issued. To date there are outstanding over $32,000,000 of CPRA's Senior Secured Bonds, the proceeds of which have been used to develop recreational and community facilities, as well as the public transportation system.

Prior to January 1, 1978, the Assessed Valuation of property subject to the Annual Charge was determined by CPRA by reference to the "full cash value" of such property as determined by the Supervisor of Assessments for Howard County for county and state real estate tax purposes. Under Maryland Code (1957, 1975 Repl. Vol.), Article 81, § 14, full cash value was defined as

> "current value less an allowance for inflation, if in fact inflation exists."

From 1958 through 1973, the inflation allowance was 40%. By Executive Order, effective January 1, 1974, the Governor increased the inflation allowance from 40% to 50%, resulting in real property valuations equal to 50% of current value.

In 1978, the General Assembly enacted chapter 175 of the Acts of 1978, amending § 14 of Art. 81 to provide a special assessment allowance equal to 5% of current value to taxpayers owning and residing in single-family or two-family homes, thereby reducing the value upon which *ad valorem* property taxes were levied from 50% to 45% of market value. Section 2 of the 1978 Act, however, provided an exemption from the effect of the special allowance for private contractual arrangements, leaving CPRA and organizations like it free to continue to levy their charges on valuations equal to 50% of current value. Had the 1978 Act not maintained the 50% inflation allowance for purposes of contracts and covenants, the Assessed Valuation of property subject to the Declaration would have been $30,000,000 less on January 1, 1979: $450,000,000 rather than $480,000,000. This would have resulted in a loss of more than $225,000 in income in calendar year 1979 alone, with increasing losses in subsequent years as the assessable base in Columbia grew. The loss of this income would also have reduced CPRA's ability otherwise to issue $2,000,000 of its Senior Secured Bonds.

By chapter 314 of the Acts of 1979, the General Assembly again changed the method by which real property is valued and assessed for real estate tax purposes. The 1979 Act made two major changes in the existing system. First, it eliminated both the 50% allowance for inflation and the special 5% allowance adopted by the 1978 Act. Effective January 1, 1980, it provided that all real property will be assessed at a percentage of full cash value, the term "full cash value" being defined by the 1979 Act as "current value" with no reference to an inflation allowance. Under the 1979 Act the Department of Assessments and Taxation is required annually to determine a "growth factor" which is applied as a percentage of current value to determine the assessment. Second, the 1979 Act provided that all real property, beginning in calendar

year 1979, will be revalued on the basis of a physical inspection conducted once in every three-year period and that any increase in full cash value resulting from this revaluation will be phased in over the ensuing three taxable years in equal increments. Section 2 of the 1979 Act, like section 2 of the 1978 Act, provided an exemption for private contractual arrangements from the adverse impact of these changes in the assessment system, again leaving CPRA and organizations like it free to maintain assessed values at 50% of current value.

Pursuant to the provisions of the Declaration and section 2 of the 1978 Act, CPRA levied the 1978-1979 Annual Charge on the Olanders' residential property, basing the Annual Charge on an Assessed Valuation equal to 50% of the current value of their property. The Olanders refused to pay the Annual Charge on the ground that the Assessed Valuation of their property could not properly exceed 45% of current value. CPRA filed a Petition for Injunction and Declaratory Relief in the Circuit Court for Howard County against the Olanders since their refusal to pay the Annual Charge called into question the Assessed Valuation of all property subject to the Declaration, thereby preventing CPRA from delivering the necessary certificates to issue additional bonds on the basis that such property is valued at 50% of current value for the purpose of the Annual Charge. CPRA sought a declaration of the parties' rights and obligations with respect to the manner in which the Olanders' property was valued for the purpose of the levy of the Annual Charge, as well as an injunction prohibiting the Olanders from interfering with CPRA's collection of the Annual Charge. Subsequent to the enactment of the 1979 Act, CPRA amended its Petition on the belief, confirmed by the Olanders' Answer to the Amended Petition, that they would refuse to pay subsequent Annual Charges to the extent that such charges are levied in accordance with either section 2 of the 1978 Act or section 2 of the 1979 Act.

By order dated January 19, 1979, the circuit court appointed counsel to represent the Olanders in the suit, the order specifying that "the fee for his services and the costs incurred

in his representation of the [Olanders] to be paid by [CPRA] as approved and directed by this Court." The order recited that counsel for CPRA had informed the court at the time of the filing of the petition that the case "may be considered as being within the ambit of the ruling in *Reyes v. Prince George's County,* 281 Md. 279, 281."

Contrary to CPRA's representation, the present case does not come within the ambit of *Reyes.* That case involved an action for injunctive and declaratory relief filed by a taxpayer challenging the proposed issuance and sale of revenue bonds by Prince George's County and the intended loan of the bond proceeds to Washington National Arena Limited Partnership (the Arena), a nongovernmental business entity. It developed during the course of the litigation that, in reality, the suit was initiated by the Arena solely to satisfy the prospective bond purchaser as to the legality of the bonds being issued to refinance the Arena's existing indebtedness. The Arena engaged and compensated counsel for the taxpayer who sued Prince George's County as well as itself to secure an opinion of this Court concerning the validity of the proposed bond issue.

We concluded that the action was a collusive one, not involving an actual antagonistic assertion of rights to be adjudicated. We said that the American system of adjudication from its inception has been grounded on the principle that adversary presentation of issues actually in dispute between the parties to the suit plays a vital and essential role in attaining justice. We said that this role is undermined when a defendant selects a plaintiff to sue him, and is further eroded when, in addition, that party pays the counsel fees for his phantom adversary. We nevertheless expressed concern that, notwithstanding the collusive nature of such suits, there were cases in which refusal to adjudicate issues could have extremely deleterious consequences — "as, for example, where a crucial city bond issue simply would not be underwritten absent a judicial determination establishing its legality." 281 Md. at 286. Against this background, we said at 287:

"Having given careful thought to the issues involved

— the collusion that we should not tolerate and the necessities that we cannot ignore — this Court with this case establishes new procedures under which actions of a narrowly defined class may be adjudicated despite their collusive characteristics, and by which the competing considerations we have mentioned may be reconciled consistent with the mandates of the Maryland Constitution, the integrity of the judicial decisional process, and our prior case law. . . ."

We first noted that, even though a suit may be collusive and dismissible on that account, there was no constitutional or statutory inhibition to our deciding such cases, provided the issues presented were justiciable under the Maryland Uniform Declaratory Judgments Act, Maryland Code (1974), §§ 3-401 to 3-415 of the Courts and Judicial Proceedings Article, *i.e.,* there were interested parties asserting adverse claims upon a statement of facts which must have accrued wherein a legal decision is sought or demanded. Recognizing our power to adjudicate cases even though collusive, and the practical necessity for judicial decision "in a narrow class of those cases," we reconciled the conflicting considerations as follows:

"A declaratory judgment suit *having as a proper party a governmental body, or an agency or official thereof,* and otherwise cognizable under sections 3-401 to -415 of the Courts Article, which action involves the validity of a statute or governmental regulation having the force of statute, or an urgently needed determination affecting future governmental conduct, and in which the public's concern is both imperative and manifest, need not hereafter necessarily be dismissed as collusive by a court of this State if there is strict adherence to the following procedures: (1) that the court is informed by the party actually initiating, promoting or financing the litigation, at the time of filing of that party's initial pleading, that the opposing party,

though having standing to maintain the suit, nonetheless appears in a manner which may render the action collusive; (2) that the party actually desiring the requested adjudication bind itself, in such manner as may be prescribed by the court, to pay at the court's direction such fees and other expenses of counsel appointed in the manner provided next below; and (3) that the court name counsel, without recommendation or suggestion by any party to the action, to present in the same manner and to the same extent as though representing a truly adverse party, a position in opposition to that taken by the party who initiated and for whose benefit the action was instituted. We think these procedures, while allowing adjudication in a narrow class of collusive actions where the necessity for it plainly appears, will nevertheless guarantee that the issues to be decided are precisely framed, focused, and thoroughly explored . . . ." *Id.* at 299-301 (italics added) (citations omitted).

The basic and fundamental ingredient of *Reyes* is that the case involve "as a proper party a governmental body, or an agency or official thereof." CPRA, as a nongovernmental business entity — a nonprofit membership corporation — is not within the ambit of *Reyes.* While in all other particulars CPRA and the lower court complied with *Reyes'* guiding precepts, the fact that CPRA provides important and vital services on behalf of the residents of Columbia cannot suffice to avoid dismissal of a collusive case for the reasons outlined. Like so many other nongovernmental entities providing services to large numbers of citizens, the services CPRA renders differ only in degree from its smaller nongovernmental counterparts providing similar services to citizens and communities throughout Maryland. To pass upon the merits of this collusive suit is to bind ourselves to take similar action in cases involving other nongovernmental entities engaged in like activities, who, as here, seek on behalf of prospective purchasers an opinion with respect to the legality of a bond issue.

We must, therefore, vacate the decree of the Circuit Court for Howard County declaring "Section 2 of Chapter 175 of the Laws of Maryland of 1978 and Section 2 of Chapter 314 of the Laws of Maryland of 1979 unconstitutional and invalid on the ground that these Sections impair the obligation of contracts in violation of Article I, Section 10 of the Constitution of the United States."

> *Decree of the Circuit Court for Howard County vacated; case remanded to that court with instructions that it dismiss the action; costs to be paid by the appellant.*

*Eldridge, J., dissenting:*

I agree with the majority that, under the majority opinion in *Reyes v. Prince George's County,* 281 Md. 279, 380 A.2d 12 (1977), the present case must be dismissed by the circuit court as "collusive." Nevertheless, I continue to adhere to my previously held position, *Reyes,* 281 Md. at 308 (concurring opinion), that such actions are not "collusive." Instead, "test" cases such as *Reyes* and the present case serve important public interests.